IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DR. BRANDON A. MINES,

     Plaintiff,

v.

EMORY HEALTHCARE, INC.,
THE EMORY CLINIC, INC.,
EMORY UNIVERSITY SCHOOL OF
MEDICINE,
THE ATLANTA FALCONS
FOOTBALL CLUB, LLC,
DR. SCOTT BODEN, and
DR. KENNETH MAUTNER,

     Defendants.

CIVIL ACTION NO.
1:24-cv-2408-ELR-CMS

## NON-FINAL REPORT AND RECOMMENDATION

In this case, Plaintiff Brandon A. Mines has sued the following six defendants for claims related his employment as a physician: Emory Healthcare, Inc. ("Emory Healthcare"), The Emory Clinic, Inc. ("Emory Clinic"), Emory University School of Medicine ("School of Medicine"), Dr. Scott Boden, Dr. Kenneth Mautner, and the Atlanta Falcons Football Club, LLC ("Falcons"). I will refer to the first three defendants collectively as the "Emory Defendants."

In his mammoth 104-page, thirteen-count Second Amended Complaint, Mines raises five federal claims:

- Race discrimination under Title VII of the Civil Rights Act of 1964, as amended ("Title VII") against the Emory Defendants ("Count One") [Doc. 52, Second Am. Compl. ("SAC") ¶¶ 152–67];

- Race discrimination under 42 U.S.C. Section 1981 ("Section 1981") against all Defendants ("Count Two") [*id.* ¶¶ 168–87];

- Title VII racially hostile work environment against the Emory Defendants ("Count Three") [*id.* ¶¶ 188–208];

- Title VII retaliation against the Emory Defendants ("Count Four") [*id.* ¶¶ 209–16]; and

- Section 1981 retaliation against all Defendants ("Count Five") [*id.* ¶¶ 217–27].

He also raises the following eight state law claims:

- Intentional infliction of emotional distress against the Emory Defendants, Boden, and Mautner ("Count Six") [*id.* ¶¶ 228–38];

- Negligent infliction of emotional distress against the Emory Defendants, Boden, and Mautner ("Count Seven") [*id.* ¶¶ 239–49];

- Negligent retention against the Emory Defendants ("Count Eight") [*id.* ¶¶ 250–75];

- Defamation against all Defendants ("Count Nine") [*id.* ¶¶ 276–93];

- A claim for common-law fraud in the inducement against the Emory Defendants and Boden ("Count Ten") [*id.* ¶¶ 294–304];

- A claim for breach of contract against the Emory Defendants ("Count Eleven") [*id.* ¶¶ 305–19];

- Breach of contract against the Falcons ("Count Twelve") [*id.* ¶¶ 320–34]; and

- Unjust enrichment and quantum meruit against the Falcons ("Count Thirteen") [*id.* ¶¶ 335–43].

The Emory Defendants, Boden, and Mautner have jointly moved to dismiss portions of the Second Amended Complaint, and the Falcons have separately moved to dismiss portions of the Second Amended Complaint, too. [Docs. 56, 57]. For the reasons that follow, I will recommend that both motions be granted.

## I.    BACKGROUND

### A.    Mines's Allegations[1]

#### 1.    The Parties

Mines is a Black male who resides in Georgia, and he is a board-certified family medicine and sports physician with twenty years of experience, including experience in treating sports-related injuries for professional athletes. [SAC ¶¶ 2, 8, 21–22]. Mines is an active member of the American Medical Society for Sports Medicine, has presented at national conferences, and is also an adjunct professor at Morehouse School of Medicine. [*Id.* ¶¶ 23–24].

Emory Healthcare and the Emory Clinic are Georgia nonprofit corporations that conduct business in this District. [SAC ¶¶ 9–10]. The School of Medicine is a

---

[1] The following facts are taken from the Second Amended Complaint and are accepted as true for purposes of resolving the motions to dismiss. *Rivell v. Priv. Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (per curiam).

division of Emory University, a nonprofit corporation that also conducts business in this District. [*Id.* ¶ 11]. Mines alleges that the Emory Defendants are each "responsible for the actions of [their] employees, agents, and representatives acting on [their] behalf through the legal doctrines of respondeat superior and vicarious liability." [*Id.* ¶¶ 9–11].

The Falcons are a professional football team and are a subsidiary of the Atlanta Falcons Holding Company, LLC. [SAC ¶ 12]. The Falcons conduct business in this District. [*Id.*].

Boden and Mautner are white physicians who reside in Georgia, and, according to the Second Amended Complaint, Boden and Mautner are employees of the Emory Defendants. [SAC ¶¶ 3, 13–14]. Boden and Mautner supervised Mines. [*Id.* ¶ 3].

Boden is the Chairman of the School of Medicine's Department of Orthopaedic Surgery, as well as a Tenured Professor of Orthopaedic Surgery. [SAC ¶ 28]. Boden "serves as the Chief Strategy Officer for the Healthcare System and The Woodruff Health Science Center," and he also serves as the Chairman of the Board of Managers of the Emory Healthcare Network. [*Id.* ¶¶ 28–29].

Mautner is the Division Director of Emory's Primary Care Sports Medicine Clinic, as well as an Associate Professor in the Department of Physical Medicine

and Rehabilitation and the Department of Orthopedic Surgery. [SAC ¶ 32]. Mautner serves as the Head Team Physician for the Atlanta Hawks, as a team physician for the Atlanta Braves, Emory University, Agnes Scott College, and Pace Academy, and as a consulting physician for Georgia Tech athletes. [*Id.*].

### 2. Emory's Sports Medicine Practice

According to the Second Amended Complaint, "Emory's Sports Medicine is a division of the Department of Orthopaedics that provides a broad range of evaluation and treatment of sports injuries." [SAC ¶ 26]. "Emory Sports Medicine is the official sports medicine provider for the Atlanta Falcons, the Atlanta Hawks, the Atlanta Braves, and the Atlanta Dream." [*Id.* ¶ 27].

### 3. Mines Joins Emory and Begins Relationships with Professional Sports Teams and Local Colleges

On August 18, 2005, Mines signed a contract with Emory Clinic and the School of Medicine to serve as an Assistant Professor of Orthopaedics, and he began his employment in September 2005. [SAC ¶ 34]. Mines also provides medical care and support for professional, collegiate, and elite athletes, including serving as (1) the Head Team Physician for the Atlanta Dream since 2008, (2) an Associate Team Physician for the Atlanta Hawks, (3) Medical Director for the Harlem Globetrotters, and (4) the Medical Director for Clark Atlanta University ("Clark Atlanta" or

"CAU"). [*Id.* ¶¶ 35–38]. Mines also works with elite high school athletes at Overtime Elite. [*Id.* ¶ 38].

### 4.    Mines's Relationship with the Falcons

In 2011, Mines began serving as a team physician for the Falcons. [SAC ¶ 39]. According to the Second Amended Complaint, Mines became the Head Team Medical Physician for the Falcons in 2014. [*Id.*]. In that role, he "earned the respect and attention of those in leadership positions at the National Football League" ("NFL") by, among other things, (1) being appointed to the NFL's twelve-member Head, Neck, and Spine Committee, as well as to the NFL's Lower Extremity Soft Tissue Injury Task Force, (2) serving as the NFL team representative on a three-physician panel that was responsible for rewriting the disability program for retired NFL players, and (3) serving as a member of the NFL's Diversity in Sports Medicine Pipeline Initiative, where he played a "crucial" role "in developing and implementing the NFL's HBCU medical student diversity pipeline initiative." [*Id.* ¶¶ 40–43].

### a.    The 2019 Agreement

On May 1, 2019, Mines executed a contract between Emory Healthcare, the Emory Clinic, the Falcons, and Dr. Kyle Hammond that governed the roles and responsibilities for Head Team Physician coverage for the Falcons from 2019

through 2022 ("2019 Agreement").  [SAC ¶ 45; Doc. 1-5[2]].  The 2019 Agreement contained a provision governing compensation and payment for medical and surgical services.  [Doc. 1-5 at 8].

### b.    The 2023 Agreement

On March 14, 2023, Boden emailed Mines and Hammond an agreement for the partnership between the Falcons and Emory[3] governing the years 2023 through 2027 ("2023 Agreement").  [SAC ¶ 47; Doc. 1-6].  The 2023 Agreement contained a provision governing compensation and payment for medical and surgical services that was the same as the provision in the 2019 Agreement.  [Doc. 1-6 at 8].

According to the Second Amended Complaint, Boden "demanded that [Mines] sign [the 2023 Agreement] immediately."  [SAC ¶ 47].  On March 15, 2023, Boden sent Mines a text message.  [*Id.* ¶ 48; Doc. 1-7].  The message stated: "Hi

---

[2] The Second Amended Complaint incorporated the exhibits that Mines filed with his initial Complaint.  [SAC at 1 n.1].

[3] The Second Amended Complaint defines Emory Healthcare, the Emory Clinic, and the School of Medicine as either "the Emory Defendants" or "Emory." [SAC at 1–2].  Based on context, it appears that Mines does not always stick to this definition.  In any event, when I use the term "Emory," I am taking it directly from the Second Amended Complaint.

Brandon.  Did you get my email with Falcons agreement that needs to be signed electronically?" [Doc. 1-7 at 1].[4]  Mines responded:

> Hi Scott.  I got it.  I am putting together my thoughts about it.  Between you and me, there are a few things about the contract that concern me. I can communicate that more later since the first I have seen it was yesterday.  I understand that time is [of] the essence so I will be as quick as I can be with getting back to you with my thoughts.  Thanks for your support.

[*Id.*].  Boden responded, "Brandon, it's the same contract you signed last time, only updated compensation and tickets/parking numbers.  Falcons and Emory have already signed and legal approved, so we can't make changes."  [*Id.*].

On March 25, 2023, Boden texted Mines, stating: "Brandon, it's been 10 days and I haven't heard anything from you.  I need to move that Falcons contract along." [Doc. 1-7 at 1].  Mines responded:

> Thanks for the reminder.  I am finishing up an email that is outlining the specific terms I have questions on.  While I know in spirit, it is the "same" document presented in the past, the current landscape has changed and I wanted to fully check on that.  I will get that email to you no later than tomorrow.

[*Id.*].  Boden replied, "Thx."  [*Id.*].

---

[4] As discussed below, some of the allegations in the SAC conflict with the corresponding exhibits.  To provide full context for the district judge, I have quoted directly from the exhibits when possible.

On March 25, 2023, Hammond texted Mines, stating, "Boden not happy you still haven't signed Falcons contract[.]  If there's an issue, please let him or me know[.]  Just fyi[.]"  [Doc. 1-9].  Mines responded that same day, stating:

> I appreciate your reminder.  Since Boden is the person with whom I will need to discuss any questions I have, an email is being prepared for him outlining the specific items I have questions on.  While I know in spirit, it is the "same" document presented in the past, the current landscape has changed, and I sought counsel (as is my right) on how this "same document" fits in the current lay of the land with the new NFL mandated requirements.  I am sure Boden will keep you in the loop.  Have a nice weekend.

[*Id.*].  Hammond responded, "Ok, thanks for the update.  All[] good.  He just asked me to remind you each time I said something to you.  Thx."  [*Id.*].

On March 27, 2023, Mines sent an email to Boden stating, in relevant part:

> Hi Scott, I appreciate you understanding that I needed time to fully assess the contract and all that it said.  As I know you can appreciate, any time one signs a contract it is important to understand what is in it and not in it.  Language is everything, and as such, trying to make sure the proper intent is conveyed in the contract is of the utmost importance. To be honest, I wasn't sure when we were going to be talking about the next contract, but I figured that when we did, it would reflect the changes that were made in the most recent CBA.  Since this contract has several stakeholders (Falcons, Emory, Physicians), my opinion is that they all need to be properly represented.  As far as Emory goes, my first thought (as you have heard me say throughout my career) is to make sure we are not putting ourselves in a position for anyone to question our intent or attention to detail (i.e. make sure our brand is solid).  Certainly, I have to look out for myself as well, hence me taking time to figure out how to communicate what's on my mind.  As you will see below, the issues I found could affect Emory, as well as myself. I think it would probably be a good idea for you and me to sit down and

talk about it all. A lot can be lost in the communication via email, so it may help to explain the nuances of what I do with the team in more detail. For your convenience, see the 2011 CBA and 2020 CBA attached. Thanks for your time!

***The current contract, as it is written, reflects the 2011 CBA and not the new 2020 CBA. There are relevant and important team physician changes. See below for relevant passage from 2020 CBA.***

. . .

***Head team orthopedist and head team medical doctor have responsibilities specific to them. Head team physician can be either orthopedist or PCSM. NFL requires both physicians for each team. Falcons agreement does not address that there are 2 head team physicians (Head team orthopedist and Head team PCSM).***

[Doc. 1-8 at 2–4 (emphasis in original)]. Mines also raised concerns about specific provisions of the 2023 Agreement, including the provision concerning compensation. [*Id.* at 5]. Mines questioned why the compensation provision contained a statement about services provided by Dr. Destin Hill as well as Mines, stating, "[O]nly one team medical doctor is considered the head medical team physician. As previously described, the head medical physician has separate responsibilities than the other team medical doctors. As such, it seems compensation should reflect that." [*Id.*]. Mines also asked about the provision concerning tickets, stating:

[S]ince I ought to have my own section, not to include [Hill], then it would seem I could be assigned my own ticket allocation (just like [Hammond], the other head physician). As a head physician, seems fair

10

> to allow me to have more tickets than other medical team doctors. I could share with other medical team doctors as needed, just like Hammond could share (but not required to).

[*Id.*]. Mines complained about the services provision of the 2023 Agreement, noting that it did not need to state "under the guidance of head team physician" because the section should only be referencing Mines as the Head Team Medical Physician. [*Id.* at 5–6].

Mines also asked about the provision of the 2023 Agreement governing replacement of team physicians, stating that it "does not reflect the new CBA, which makes it clear that there are 2 head physicians" and that as it was written, the provision only protected Hammond, not Mines. [Doc. 1-8 at 6]. Mines also stated that the provision of the 2023 Agreement stating that Emory could propose a First Associate Team Physician to work alongside the Head Team Medical Physician "really has no place in the contract, in light of the 2020 CBA." [*Id.*].

Mines also stated:

> Over the years of taking care of the Falcons as their head medical physician, I have gained the respect and attention of those in leadership positions at the NFL. I have been appointed to the Head, neck, spine committee (and recently been asked to be the sole representative from the NFL physician society (NFPLS) on the committee). I also have been appointed to the Lower extremity injury task force, as well as being the NFL team physician representative on a panel of 3 physicians (task of re-writing the disability program for retired NFL players). I was the NFL team doctor that Allen Sills called in 2020 and asked to do this (out of all the other NFL team doctors). This physician

11

disability panel is a big deal, since we are tasked with re-working how millions of dollars will be distributed to disabled former NFL players. In addition to this, I have been a key member in the development and implementation of the NFL's new HBCU medical student diversity pipeline initiative. The working group I am a part of helped bring to life this initiative, one that brings in medical students from under-represented minorities and allows them to experience what it would be like to be a team doctor for an NFL team. As the only black head medical physician in the entire NFL, this initiative means a lot to me. I say all of this because it shows my stature within the NFL. The reason I even have these positions is because of my position of head medical physician. It has allowed me to have the ability to speak to the right people and be in the right rooms over time. While this may sound like it benefits me (and it does), I firmly believe the biggest benefit is Emory Orthop[a]edics and Sports Medicine. Wherever I go, I carry Emory and the excellence we represent. I think you know that about me by now.

[Doc. 1-8 at 6–7]. Mines concluded his email by stating:

Take home points:

Per current NFL CBA, each team has 2 Head team physicians (Head team orthopedist and head team medical). The NFL grants authority to these physicians (only), regarding clearing a player to return to participation in football activities. Also, the head team physicians have the authority (in their respective roles) to modify and override any decisions made by the athletic trainers, coaches and strength coaches.

One of those doctors assumes the singular title of Head team physician, but the current NFL CBA does not endorse that one head team physician is above/directs/assists the other. The two head team physicians work together and in tandem for the team.

To stay in line with the current NFL CBA, the roles and titles for those 2 doctors should be listed in any contract between the team and physician.

The Head physician that assumes the role of head team physician has the most time commitment with the team, and as such should have the highest reimbursement (i.e. more reimbursement than head medical physician).

The Head physician that assumes the role of head medical physician has more time commitment, expectations and authority from the club than other team medical doctors.  For example, being the only doctor that is aware of any players who test positive for substances of abuse (the head team orthopedist is purposely not informed of that).  I must keep track of these players and communicate with relevant therapists the players see.  Head medical physician also has to communicate with the team mental health professional in regard to medications being used and what status each player has in regard to relevant controlled substance prescriptions they use (i.e. Adderall, Vyvanse, etc.), again – head team orthopedist is not privy to this information.  Not to mention, just the general requirements that come up with being in this position.  As such, this role should have a better reimbursement than other team medical doctors for the totality of services provided.

Destin Hill does not need to be in this contract that we sign with the team since the NFL has no expectations/obligations and grants no authority to him.  If Emory/Falcons want him on the contract, then at the very least he should have his own exhibit in the contract and not be connected to me with an "and/or" statement.  In addition to this, [Hill] and I are not interchangeable, despite what it seems like on paper.  While he has been working with the Falcons as a PCSM team physician, he did not do that role in Arizona.  At the risk of speaking out of turn (and by no means passing judgement or being mean about anything), his comfort level is in orthopedics (as witnessed by him working the orthopedic rooms (not medical) at the combine since he has been with the team).  I believe this is relevant from the standpoint of how we define these roles.  As it is written in the proposed contract, he and I are interchangeable.

[*Id.* at 7–8].

13

Boden responded to Mines's email that day with an email stating, in relevant part:

Appreciate your careful review and questions which I will attempt to answer.

The team has requested that [Hill] be elevated to a higher role than just consulting physician and they are fully aware of his experience and capabilities and qualifications, and thus they want him included in the contract. This was their request, not ours. Accordingly, they put the two Medical Physicians in a combined exhibit because the wording is the same and the compensation to Emory is for the two docs combined. That was the Falcons['s] choice. This is a contract between Emory and Falcons, not you, and your signature simply signifies that you are aware of the terms of the contract.

The compensation from Falcons to [Emory Healthcare] is not the same as the way we distribute dollars for the roles inside [Emory Healthcare]. It is only to record how much the Falcons pay Emory for each category of physician. For example, Dr. Lamplot's compensation was not separately noted in the contract nor any of the other consulting physicians that may be compensated by Emory for coverage. How we distribute remains up to us and thus will not be reflected in the Falcons/Emory Contract.

Your team title has always been Head Team Medical and it will not change for 2023 Season. You are listed as a "voting" member in the NFL PS Directory that just came out, and there are only two voting members for each team, and you are the other voting member for Atlanta. Your title was not written in the prior contract, yet you still have the title. If you would like a letter from the Falcons re-affirming your title for the 2023 season, we are happy to ask them for that. The Falcons have not put any title other than Head Team Physician into the Emory Contract and that is th[eir] choice. The CBA doesn't require the designated Head Team Medical physician to be identified in the multi-year medical contract.

14

As for tickets, what's in the contract is what the Falcons are comfortable with at this time. As you know, upon request from individuals the Falcons have periodically increased the ticket assignments without it being in the contract.

Given the above, if you want to participate this season, and I hope you will, I do need you to sign the contract now.

You should be aware that the Falcons can request changes in any of the physicians at any time regardless of whose names are in the contract and I'm sure [they] would be happy to provide you with a letter confirming your current status as Head Team Medical Physician.

You have already delayed this process two weeks without informing us until this weekend and at this point, I need you to sign in the next two days, or I'll have to move along with the rest of [the] signatures and let the Falcons know you have chosen not to sign. This is the contract format the Falcons have chosen to use and it does not preclude any of the functional preferences that you indicate which are required by the 2020 CBA.

[Doc. 1-8 at 1–2 (emphasis in original)].

According to the Second Amended Complaint, "Boden's tone was rude and very demanding" during the period from March 15 to March 27, 2023. [SAC ¶ 53]. Mines alleges that "[i]t was clear that Boden simply wanted [Mines] to sign the 2023 Agreement without questioning anything in the 2023 Agreement." [*Id.*]. After exchanging several text messages and emails with Boden and following a March 27, 2023, phone call with Boden, Mines executed the 2023 Agreement on March 28, 2023. [*Id.* ¶ 55]. Mines alleges that he executed the 2023 Agreement "only after Boden reassured [him] in writing that his position as Head Team Medical Physician

15

with the [Falcons] would continue and remain unchanged for the 2023 Season." [*Id.*].

According to the Second Amended Complaint, Mines "raised his concerns regarding CBA non-compliance with the [Falcons] and the NFL" as well as Boden. [SAC ¶ 49]. Mines alleges that he "was largely ignored and dismissed by Emory and the [Falcons]." [*Id.*].

Mines alleges that "[u]pon information and belief, Emory returned the 2023 Agreement to the [Falcons] on or around March 30, 2023, fully executed by all Emory parties, including [Mines], Hammond, Hill and Ira Horowitz, Physician Group President of the Emory Clinic." [SAC ¶ 56]. According to the Second Amended Complaint, on "information and belief, on or around May 3, 2023, the NFL required Emory and the [Falcons] to insert additional language into the 2023 Agreement to bring [it] into compliance with the NFL's 2020 CBA," and "the NFL required this change based on [Mines's] discussions with the NFL about the non-compliance of the 2023 Agreement." [*Id.* ¶ 57].

Mines alleges that "[u]pon information and belief, Emory, Boden, and the [Falcons] were upset with [Mines] and treated him with disdain because he told the NFL about the 2023 Agreement's non-compliance with the NFL collective bargaining agreement." [SAC ¶ 58]. According to the Second Amended Complaint,

"Emory and the [Falcons] continued negotiating the 2023 Agreement after [Mines] had already executed the 2023 Agreement with the express goal of terminating [Mines] from his position." [*Id.*].

### c.    Mines is Terminated as the Head Team Medical Physician for the Falcons

Mines alleges that "[a]fter 12 years of stellar performance and dedicated service, Defendants unceremoniously terminated [Mines] from the high-profile position of Head Team Medical Physician of the [Falcons]." [SAC ¶ 59]. Mines had requested a meeting with Terry Fontenot, who served as the General Manager for the Falcons, to discuss Mines's concerns about "unprofessional behavior and communications" by Jake Pfiel, the Athletic Trainer for the Falcons. [*Id.* ¶ 60]. During that meeting, which occurred on May 11, 2023, Mines "was casually and informally told that he was being terminated." [*Id.*]. Mines alleges that General Manager Fontenot told him that Rich McKay, the President and Chief Executive Officer of the Falcons, Emory, and Boden "collectively decided to terminate [Mines's] contract based on an alleged, albeit pretextual, 'communication issue[]' with Pfiel." [*Id.* ¶ 61].

Mines alleges, "[u]pon information and belief," that the Falcons and the Emory Defendants terminated his contract "in retaliation because he questioned the 2023 Agreement's compliance with the NFL's 2020 CBA and because [Mines]

dared to question Boden, Emory, and the [Falcons] about unfairly demoting him by requiring him to share his hard-earned role with [Hill], a less experienced white man." [SAC ¶ 62]. Mines also alleges, on "information and belief," that: (1) "Boden's decision to support [Mines's] termination from the [Falcons] was influenced by his low regard for Black people" [*id.* ¶ 63]; (2) "Boden was jealous of [Mines's] leadership and influence in the NFL as a Black physician, and he wanted to put him in his place as a Black man" [*id.* ¶ 64]; (3) "Boden took great offense when [Mines] dared to question him about the [Falcons'] 2023 Agreement renewal," and he "took the opportunity to terminate [Mines] based on a shallow and insignificant issue that would never serve as the sole basis for terminating a tenured and highly regarded physician" [*id.* ¶ 65]; and (4) "there have been other instances when white physicians transitioned from the [Falcons] and were not treated in the same manner," including when Dr. Spero Karas, a white male former Falcons Head Team physician, "was given ample warning and opportunity to resolve any issues" and "was permitted to resign from this role with dignity, thereby preserving his professional reputation at Emory and within the NFL" [*id.* ¶ 66]. According to the Second Amended Complaint, Mines "was summarily terminated from a high-profile role in the NFL without any forewarning or discussion," and he "was not afforded the same opportunity to cure or remediate [any performance] issues as his white

18

counterparts." [*Id.* ¶ 77]. Mines alleges that the "discriminatory and retaliatory motivations for his termination were even more suspect, considering he was replaced by [Hill], a less experienced and less qualified white male physician." [*Id.* ¶ 78].

Mines alleges that his "abrupt termination from the [Falcons] fueled rumors and skepticism among the players, coaches, and members of the broader [Falcons] and NFL communities." [SAC ¶ 67; *see also id.* ¶ 5 (stating that Mines's "abrupt termination" from his position as the Falcons' Head Team Medical Physician "sent shockwaves through the medical and professional sports communities")]. Mines alleges that his "sudden absence" from the Falcons "raised questions and ignited speculation about [his] alleged wrongdoing." [*Id.* ¶ 70].

When the Falcons terminated Mines, he was the only Black Head Team Medical Physician in the NFL. [SAC ¶ 68; *see also id.* ¶ 6 (alleging that Mines was the only Black Head Team Medical Physician in the NFL, and his "termination raised serious questions about fairness, equality, and unlawful racial bias within Emory and the Falcons.")]. Mines alleges that when he was terminated, he "was exactly two weeks away from being officially appointed to the NFL Physician Society Board—a colossal honor only afforded to a minimal number of Head Team Physicians." [*Id.* ¶ 68].

Mines alleges that his "public termination. . ., rather than a demotion, had severe implications" and "stained his distinguished career with an unwarranted blemish, suggesting a grave wrongdoing on his part." [SAC ¶ 69; *see also id.* ¶ 5 (stating that Mines's termination "tarnished [Mines's] impeccable reputation and undermined diversity and inclusion efforts within Emory and the NFL.")]. Mines "received daily calls from his Emory colleagues, people in NFL leadership, and [Falcons] players and staff inquiring about the reason for [his] termination." [*Id.* ¶ 71].

Mines alleges that after his termination, Defendants defamed him. [SAC ¶ 72]. Mines states that some of the false reasons given for his termination included that he "failed to maintain player medical records" and "missed a brain tumor in one of the [Falcons] players." [*Id.*]. According to the Second Amended Complaint, "[b]y spreading false rumors and defaming [Mines], Defendants dismissed [his] outstanding 20-year professional track record and imputed the racial stereotypes that [Mines], as a Black man, is angry, untrustworthy, inherently less qualified, and less deserving of opportunities relative to his white counterparts." [*Id.* ¶ 73]. Mines alleges that "Defendants characterized [him] as someone difficult to work with," which "is reflective of an all too familiar 'angry black man' stigma that is often cast

upon Black men who are strong in their morals and convictions while white men are coined as passionate for those very same attributes." [*Id.* ¶ 74].

Mines alleges that "[c]ompounding the malicious discrimination [Mines] endured, Emory and the Falcons failed to compensate [Mines], thus breaching their contract with [Mines]." [SAC ¶ 7]. According to the Second Amended Complaint, "Defendants' pattern of financial exploitation, in conjunction with Defendants' discriminatory practices, underscores the urgency for accountability and redress in this action." [*Id.*].

### 5. Mines's Relationship with the Emory Defendants, Boden and Mautner

#### a. General Allegations

Mines alleges that "[s]temming from the systemic and ingrained racial bias at Emory, the bar for [Mines], as a Black physician, to obtain [sic] was markedly higher than his white counterparts." [SAC ¶ 75]. According to the Second Amended Complaint, even before Mines was terminated from the Head Team Medical Physician position with the Falcons, he "repeatedly observed how similarly situated white physicians were afforded privileges that he was not," and he "encountered numerous instances where white physicians were not being held accountable when issues arose that objectively required addressing." [*Id.* ¶ 76]. Mines states that he

"has been publicly and privately chastised by Boden in a tone and manner that Boden has never used with any of [Mines's] white counterparts."  [*Id.* ¶ 81].

Mines states that when he "joined Emory in 2005, he had every intention to remain with Emory until his retirement."  [SAC ¶ 112].  According to the Second Amended Complaint, "[d]espite [Mines's] significant contributions and established record of performance, he faced racial microaggressions as well as overt race discrimination and retaliation at the hands of Emory as well as with the [Falcons]."  [*Id.*].

Mines alleges that "[o]ver his almost 20 years with Emory, [he] was subjected to hostile, negative, and unwarranted feedback from [Boden] and [Mautner] all of which included common racial stereotypes about Black men—that [Mines] was lazy, that he was not proactive, that he lacked motivation, that he was dishonest, [and] that he was fundamentally less qualified than his white colleagues to hold leadership positions within the organization."  [SAC ¶ 79].  According to the Second Amended Complaint, "Emory's culture is determined by its top leadership, which explains the presence of a toxic and discriminatory environment in the Emory Sports Medicine Department."  [*Id.* ¶ 80].

According to Mines, he "found himself ensnared in a progressively hostile work environment at Emory, facing a barrage of unjust treatment, unlawful

22

misconduct, racial discrimination, and retaliatory actions." [SAC ¶ 2]. Mines alleges that he made significant contributions to Emory, but "instead of recognition and advancement, [he] encountered repeated instances of discrimination and marginalization," including being "consistently overlooked for leadership opportunities in favor of white physicians," even though Mines was "the most qualified candidate." [*Id.* ¶ 3]. According to Mines, rather than acknowledging Mines's expertise, Boden and Mautner "branded [Mines] with offensive, stereotypical labels such as 'angry' and 'aggressive,' further perpetuating a hostile work environment." [*Id.*].

Mines alleges that "[t]he discriminatory atmosphere fostered by [Boden and Mautner]" violated Title VII and Section 1981 and "inflicted severe emotional distress and defamation" on Mines. [SAC ¶ 4]. According to Mines, his "opposition to race discrimination at Emory was met with retaliatory actions, further exacerbating the toxic work environment he was forced to endure, until Emory terminated Plaintiff via constructive discharge." [*Id.*].

### b.    Clark Atlanta Incident

In 2021, Mines had a disagreement with Amy DeRosa, a white female external contractor who had administrative responsibilities for trainers at Clark Atlanta. [SAC ¶¶ 82–88]. Mines claims that Boden demanded that Mines apologize to

23

DeRosa "for allegedly hurting her feelings despite the lack of evidence or justification for this accusation." [*Id.* ¶ 82 (footnote omitted)]. Mines alleges that while he was serving as Clark Atlanta's Medical Director, "Emory and [DeRosa] made decisions about team coverage without communicating adequately with [Mines], even though he was CAU's Medical Director, and no final decisions should have been made about CAU without his express approval." [*Id.* ¶ 83]. According to the Second Amended Complaint, when Mines "expressed his understandable frustration with how his leadership was being undermined as well as how Emory and [DeRosa] were treating CAU as a Historically Black College and University (HBCU), [DeRosa] responded condescendingly and disrespectfully, inclusive of jabs and explicit accusations against [Mines's] honesty and trustworthiness." [*Id.* ¶ 84].

Mines alleges that Boden defended DeRosa "while simultaneously chastising [Mines] for his 'disappointing' behavior," and Boden "demanded that [Mines] apologize to [DeRosa], who was neither Boden's colleague nor was she even an Emory employee." [SAC ¶ 85]. According to the Second Amended Complaint, "Boden did this while condoning [DeRosa's] attack on [Mines's] character and integrity and her attempts to undermine [Mines's] authority." [*Id.*].

Exhibit I to the Second Amended Complaint provides more context for Mines's allegations. [Doc. 1-10]. On July 29, 2021, Mines sent an email to DeRosa, copying Mautner and others affiliated with Emory, stating:

> Good evening. I will try and keep this brief. I spoke to Dr. Dawson at CAU and he informed me that the school has decided to use Morehouse medicine for their student athletes. They no longer will be working with Emory. While he did say that a factor in this decision was that CAU decided to use Morehouse medicine for all of their student healthcare, he did tell me a number of times that the situation with [IncreMedical] was a factor in this decision. He told me that having the ATCs pulled out at the last minute and the school being left with no help left a sour taste in their mouth. They essentially felt mistreated. He said after that all went down, they decided to search out other options. He only had nice things to say about the medical care they received but felt they had to move in a different direction.
>
> This outcome is exactly what I was afraid of. To say that I am angry is an understatement. While no one can predict the future under different scenarios, I can't help but wonder if this would have went this way if I was at least included properly in the original decision to pull the [E]mory ATCs out of the school. We have just lost an incredible opportunity for community engagement and a chance to show that we partner well with our HBCUs here in town. We have lost an awesome teaching experience for our fellows and residents. In any case, as much as I am angry I am sad. Sad that we as a sports medicine team cannot communicate better about major decisions as it affects the schools we take care of. I have been working with that school for a long time and for this to go this way is terrible. Let me reiterate. . . .no one told me that we were going to remove all the ATCs from the school that I am the medical director at. I challenge anyone to tell me we would do that with any high school we work with. Even if we wanted to do that, a conversation would have been had with the doctor taking care of that school.

Anyway, that's it.  Please, let us all remember that we are awesome and the "major player" in town as far as sports medicine, but don't think for a minute that someone else isn't waiting to snatch things from us when we take our assets for granted.

Have a good evening.

[*Id.* at 4].

On July 30, 2021, DeRosa replied to Mines's email, copying Boden, Mautner, and others associated with Emory:

With all due respect, I wanted to remind you of the timeline with Clark Atlanta University.  Again, I am sorry that Lin Dawson has taken his frustration out on you.  And I am sorry that they decided to make a change in their student health provider and have included their student athletes in that change.

To be clear, while I do advise on business matters, I cannot and will not make decisions unilaterally that contractually obligate Emory or terminate relationships.  I am involved in the discussions, yes.  I might have a vote or give my opinion, but the decision is not mine to make. As a good partner though, I will communicate those decisions to Emory's partners.  The Clark Atlanta decision was one of those in which I opted to 'take one for the team' so to speak.  If there was anger directed at anyone, I wanted it to be IncreMedical.  Maybe I did that a little too well; quite frankly, I never expected that anger to come from one of our department physicians.

As far as you being unaware of our plans, let's review the timeline of our communication with CAU:

During the winter and spring, Lin Dawson communicated to Jeannine Holmes his intent to hire Athletic Trainers to be employed directly by CAU.  We received it in writing from him in an email on 4/6/2021 (See 1st attachment – Clark Atlanta and Emory Introductions).  In Fall 2020, Lin Dawson communicated his intention not to renew our Agreement

26

and did not sign a new contract; we continued to help them on a month to month basis with staffing at CAU.

On May 4, Chelsea [Richardson] communicated our intention to this group to change our relationship and the reasoning behind that recommendation (See 2nd attachment – Re: CAU ATC Support).

Your response: *Hello. Yes, I guess I would say we probably ought to not blame referrals for 20-21 since student athletics took a hit due to covid restrictions, but I understand the whole not getting paid thing.*

*Overall, I have no issues though with going back to only physician coverage.*

*Thanks.*

And then when we let the group know of our intent to talk with Lin Dawson, your response was: *No problem.*

On May 10, I started to call and email Lin Dawson. On May 27, I finally received communication from Myra Blow to schedule a call on June 1 during which Lin Dawson again communicated his intention to hire their own Athletic Trainers. Dr. Dawson left the call abruptly when I let him know about the change in our relationship. I stayed on with Myra to discuss transition and how we could help with that. She was not surprised at all by the decision.

On June 1, you sent an email about Lin Dawson reaching out to you. (See 3rd attachment – CAU). I responded with a synopsis of what happened on the Zoom call with him and how we were proceeding.

On June 3 you sent another email which Chelsea responded to. (See 4th attachment – FWD: CAU ATC Support)

On June 4, I sent an email to CAU which outlined that we were willing to assist with the transition, in case they needed our help. (See 5th attachment – CAU Transition Plan)

27

We scheduled a zoom call on 6/7/2021 with you in attendance where we had the opportunity to discuss this as a group.

On 6/9/21, Chelsea crafted a response based on our zoom call which you responded to with zero edits.

As far as questioning the business decision, here is what we reviewed:

We took 2 main things into account when making this decision.  (1) Lin Dawson had been very vocal about changing the relationship between Emory and CAU, he wanted to hire at least 2 of the 3 stationed there.  (2) Data driven decision based on Physician referral data.

. . .

We had 3 full time college/university Athletic Trainers there, plus Kim Winn (at a supervisor's salary).  That is a huge financial commitment, more than any other entity that we provide Athletic Trainers to.  Had CAU reimbursed as they promised, we would have had 50% of our costs for the 3 Athletic Trainers, keep in mind we staffed it with 4, but that did not happen.  We spent $0 on ATC coverage in 2017-2018 for 55 MD referrals; we spent $210,038.75 in 2018-2019 for 25 MD referrals, $299,893.10 for 48 MD referrals in the 2019-2020 school year and in 2020-2021, we spent $314,887.75 for 1 referral.

. . .

Even if we gave them credit for the 'Covid year' for the highest annual number of referrals (128 total referrals for 3 contract years), it would still cost $4,995.75 per referral.

We have continued to be good partners as Kim Winn is still providing coverage at CAU for a PRN rate, which we have extended several times per CAU request while they recruit.

28

> We have also been thanked over and over again by Myra Blow, Associate Athletic Director of Internal Operations at CAU, for our professionalism and communication during this transition.
>
> Dr. Mines, what makes me sad and angry is to have my integrity questioned after more than 18 years with Emory. You were in the loop, you agreed with the decision when presented with the facts, and we have given you ample opportunity to participate in the transition. I am sorry that Lin Dawson made a decision that you did not agree with, none of us wanted that to happen for you or for Emory. Had he simply renewed the Agreement, and/or stuck to the terms of our Agreement as far as compensation and staffing or had been a good partner for Emory, we would not be in this situation.

[Doc. 1-10 at 1–3 (emphasis in original)].

> Later that same day, Boden emailed Mines, stating:
>
> The paper trail does not support the accusations in your earlier group email. While I understand your frustration they decided to change providers, Amy's email suggests your email was not accurate. I would suggest you owe her and the others involved an apology, but will leave that decision to you.
>
> The admin team is likely very disappointed with your group email.

[Doc. 1-10 at 1]. Mines alleges that after this incident, "Emory took a further discriminatory and retaliatory step in [Mines's] 2021 fiscal year performance evaluation by referring to [Mines] as 'aggressive,' thereby invoking derogatory racial stereotypes and revealing racial animus toward [Mines] as a Black man." [SAC ¶ 86].

29

According to the Second Amended Complaint, "Emory's and Boden's historically demeaning, dismissive, and disparate treatment toward [Mines] was not just inappropriate and unprofessional; it also indicated a clear pattern and practice of racial discrimination, mainly and specifically against Black people." [SAC ¶ 87]. Mines alleges that "Boden's consistent efforts to undermine, belittle, and discredit [Mines's] work in front of his colleagues and third parties went beyond simple workplace disagreements and conflicts." [*Id.* ¶ 88]. According to the Second Amended Complaint, "[t]his was not simply a case of a demanding boss but rather a systemic pattern of racial discrimination and retaliation being perpetrated by one of Emory's most senior C-level executives." [*Id.*].

### c.      Visitor Policy Complaint

Mines states that on January 23, 2023, Chelsea Richardson, the Clinic Manager for the Emory Clinic, told Mines in writing that "neither his wife nor his children were permitted to visit him in the office." [SAC ¶ 89]. Specifically, Richardson emailed Mines, stating:

> Friendly reminder that any visits from your wife should be done in a non-clinical area and at a time when you're not actively seeing patients. You're welcome to eat lunch with her in an isolated space like the VIP room or the conference room, but she otherwise shouldn't be spending time in the pod or other clinical area. If she arrives early for lunch, please ask her to wait in the car until you're done seeing patients so you can escort her in any employee-only areas for lunch.

Appreciate your understanding.

[Doc. 1-11 at 2].  Mines initially responded:

> Never heard that was a policy.  Otherwise I would have done things differently.  Not trying to not follow certain rules we had, just so you know.
>
> Thanks, will adjust family visits moving forward.

[*Id.*].  Richardson replied, "No worries — thanks for understanding!"  [*Id.*].

Later that same day, Mines emailed Richardson, stating, "Are the kids the issue or just her?  [B]ecause I find it really odd that there is some sort of policy that my wife can not come see me in my work pod?  Am I missing something here?" [Doc. 1-11 at 2].  According to the Second Amended Complaint, Mines questioned Richardson about the policy "[b]ecause it is a common practice for Emory physicians to have their families visit them at work."  [SAC ¶ 90].  Richardson responded, "Sorry — any visitor.  It's a general visitor policy — we can't have them in the pod or other clinical areas where patients and/or patient information is discussed or visible.  [It is] primarily a HIPAA thing."  [Doc. 1-10 at 2].

On January 30, 2023, Mines forwarded Richardson's emails to his direct supervisor, Dr. John Xerogeanes.  [Doc. 1-11 at 1].  Xerogeanes replied:

> I don't know.
> I guess just have lunch in Conf room.
> Can't win this one.

[*Id.*].  Mines responded:

> [T]hanks for you[r] quick reply.  [F]irst and foremost, I am not talking about eating lunch here at the office.  Nadine has never ate lunch here with me.  [W]e are talking about random drop in visits (which is 99% of the time with kids).
>
> So what you are telling me is that there is an Emory policy that no one working here in our building can have a visitor of any type in the pod areas or clinical areas?  And if anyone does have a visitor, they either need to wait in their cars until that person is escorted to a conference room or employee-only area (if that visitor wants to come into the building)?

[*Id.*].  Xerogeanes replied, "I don't know if anything.  I think they can make a case for not being in pods secondary to HIP[AA].  But they can come any other place in [the] building."  [*Id.*].

According to the Second Amended Complaint, Mines complained to Xerogeanes "when it became clear that this policy was only being applied to [Mines] as a Black physician."  [SAC. ¶ 90].  Mines alleges that "Emory failed to investigate or resolve [this] complaint."  [*Id.*].

### d.    Allegations About Promotions

According to the Second Amended Complaint, Mines "has been passed over—time and time again—for leadership positions and opportunities for advancement at Emory."  [SAC ¶ 91].  Mines states that "[t]here has been a systematic denial of opportunities that are otherwise readily available to his white

peers." [*Id.*]. According to the Second Amended Complaint, "[d]espite possessing qualifications and expertise surpassing his white colleagues, [Mines] has been conspicuously overlooked for leadership roles," and "[t]his pattern is not only indicative of bias but is also direct evidence of race discrimination." [*Id.* ¶ 92].

### i.    Sports Teams

Mines alleges "[u]pon information and belief" that Xerogeanes recommended to Boden in 2015 that Mines "be considered as the Head Team Physician for the Atlanta Hawks." [SAC ¶ 93]. When Emory announced its partnership with the Atlanta Hawks in 2016, it appointed Hammond as the Head Team Orthopedic Surgeon and Mautner as the Head Team Medical Physician. [*Id.*]. Mines alleges that Mautner "had no professional team experience." [*Id.*]. According to the Second Amended Complaint, Mines "was not allowed to interview for the positions, and upon information and belief, Boden made the appointment decisions and rejected [Xerogeanes's] recommendation." [*Id.* ¶ 94].

Mines alleges that Emory first contracted with the Falcons to serve as official team physicians in 2011. [SAC ¶ 95]. Mines states that he "was not informed until an email went out asking for game coverage interest, discovering Jeff Webb was given the Head Team Medical position and Dr. Spero Karas the Head Team Physician position." [*Id.*]. Mines alleges "[u]pon information and belief" that

"Boden hand-selected Dr. Webb and Dr. Spero as Head Team Physicians, even though [Mines] was the only Emory physician with experience as a Head Team Physician for a professional team (the WNBA's Atlanta Dream)." [*Id.* ¶ 96].

According to the Second Amended Complaint, "[i]n 2017, just like in times past, Emory contracted with the Atlanta Braves to be the team physicians, exclusively listing white physicians in the press release without consulting Black or brown physicians about their interest in serving." [SAC ¶ 101]. Mines alleges "[u]pon information and belief" that "Boden was the final decisionmaker on the appointments." [*Id.* ¶ 102].

According to the Second Amended Complaint, Dr. Karas, a former Falcons Head Team physician, recommended to Boden in 2019 that Mines serve as the Head Team Physician for the Falcons. [SAC ¶ 97]. Mines alleges that "[t]his recommendation was not made casually but based on [Mines's] stellar track record serving the Falcons with exceptional dedication and professionalism." [*Id.*]. According to the Second Amended Complaint, "[t]his recommendation was well deserved and warranted, given that [Mines] had the longest and most expansive professional experience supporting professional sports teams at Emory, including the WNBA and NBA." [*Id.* ¶ 98]. Mines alleges that Karas's endorsement "was significant given [Karas's] reputation and deep knowledge of the sector, and it

34

further emphasized [Mines's] suitability and capabilities for the role in question." [*Id.* ¶ 99]. According to the Second Amended Complaint, "Emory ignored the recommendation and hired [Hammond], a significantly less experienced and tenured white male." [*Id.* ¶ 100]. Mines alleges that "[t]his significant endorsement, and the subsequent disregard of it, is one of many examples of [Mines] being overlooked and rejected for positions where he was the most qualified." [*Id.*].

Mines alleges that "[u]pon information and belief, Boden was the final decisionmaker on the appointments for Head Team Physicians for the Atlanta Hawks, the Atlanta Braves, and the [Falcons]." [SAC ¶ 102]. According to the Second Amended Complaint, "[e]very time, Boden appointed only white physicians for this leadership position," and "[e]ven worse, Boden intentionally and maliciously rejected recommendations from other Emory leaders regarding [Mines's] candidacy to be the Head Team Physician for the [Falcons] in 2019 and the Atlanta Hawks in 2016." [*Id.* ¶ 103].

### ii. Primary Care and Sports Medicine

Mines further alleges that "[u]pon information and belief, Mautner was cherry-picked and given the position of Director of Primary Care Sports Medicine in 2011 without consideration of any other qualified physicians." [SAC ¶ 104]. In 2021, Mines suggested to Boden that a new role be created for him and that he be

35

given the title "Co-Director of the Sports Medicine Department." [*Id.* ¶ 105]. Mines envisioned that in this role, he and Mautner "would lead the Sports Medicine Department together." [*Id.*]. According to the Second Amended Complaint, "Boden said it was a good idea and that he would take it under consideration." [*Id.*].

Mines alleges that in 2022, he "sent an email to Boden and Mautner following up on his prior request for leadership opportunities at Emory," and he reminded Boden and Mautner "that he had been asking for a promotion since 2021." [SAC ¶ 106]. According to the Second Amended Complaint, "Boden and Mautner promised to prioritize [Mines's] request." [*Id.*].

At an unspecified time in 2023, Mines "discussed the co-directorship idea for the third time with Mautner." [SAC ¶ 107]. According to the Second Amended Complaint, Mines "faced resistance and pushback from Mautner, who did not want to share his leadership position with [Mines]." [*Id.*].

Mines alleges that on October 5, 2023, he "complained in his annual review to Mautner and Chelsea Richardson (the Clinic Manager for the Emory Clinic) that he kept getting the runaround from Boden and Mautner regarding the Co-Director of Sports Medicine position." [SAC ¶ 108]. According to the Second Amended Complaint, on December 19, 2023, "Mautner emailed the Sports Medicine Team announcing the creation of a 'Sports Medicine Outreach Lead,' which sounded eerily

36

similar to the position [Mines] had been requesting since 2021." [*Id.* ¶ 109]. Mines alleges that "the job description was watered down, and the position was not a leadership one." [*Id.*]. According to the Second Amended Complaint, "[u]pon information and belief, Boden and Mautner intentionally retaliated against [Mines] by creating a lower-level position that neither acknowledged nor provided him with an appropriate role commensurate with his experience." [*Id.* ¶ 110].

On December 20, 2023, Mines asked Mautner "about creating a position that sounded like the role [Mines] had requested since 2021." [SAC ¶ 111]. According to the Second Amended Complaint, "[i]n response, Mautner confirmed that Boden decided against promoting [Mines] to Co-Director of the Primary Sports Medicine team." [*Id.*].

### e.    EEOC Charges and Internal Complaints

### i.    June 2023 EEOC Charge

On June 12, 2023, Mines filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against the Emory Defendants. [SAC ¶ 17; Doc. 1-2]. Mines states that he did so "due to [his] growing disillusionment with Emory's discriminatory culture," and that he alleged "race discrimination concerning his termination from the [Falcons]" in his Charge. [SAC ¶ 113].

### ii.    October 2023 Complaint to Mautner

Mines alleges that on October 5, 2023, during his annual evaluation, he complained to Mautner "that his termination from the [Falcons] was racially motivated." [SAC ¶ 114]. According to the Second Amended Complaint, "Mautner assured [Mines] that could not be the case and attempted to empathize with [Mines] by pointing out he (Mautner) had a Black son and, therefore, fully understood everything [Mines] experienced as a Black man." [*Id.*]. Mines alleges that "Mautner's comment was not only tone-deaf and highly offensive, but it also evidenced racial bias and insensitivity to [Mines's] response from his direct supervisor after making an explicit complaint about race discrimination." [*Id.* ¶ 115].

### iii.    First Formal DEI Complaint

On November 25, 2023, Mines filed a formal complaint with Emory's Diversity, Equity, and Inclusion ("DEI") department. [SAC ¶ 116]. Mines alleges that "[a]fter multiple emails, conference calls, and Zoom meetings, [Mines] was eventually advised by Ruth Vaughn that Emory would not investigate his race discrimination complaint because of the overlap between his complaint and the pending EEOC charge filed." [*Id.*].

### iv.    Complaint About Richardson

On February 8, 2024, Mines complained to Boden and Mautner about "insubordination and disrespect from Chelsea Richardson," the clinic manager. [SAC ¶ 117].  Mines sent an email to unidentified recipients stating:

> Honestly, I never anticipated that my simple request for clarity about my practice would turn into such a complicated situation.  I didn't think I was asking for something that would stir up trouble or cause confusion, but it seems to have done just that.  It was not my intention at all.
>
> As one of the most tenured physicians in our entire department, I believe I have every right to understand my practice better and raise any concerns I might have.  I expected to work with patients who have sports-related injuries, or at least those related to exercise.  I didn't expect to see patients in that didn't meet the sports triage (as I have known it to this point).
>
> However, I understand that you all have decided to put these issues on hold until Chelsea returns from leave.  I can live with that.
>
> What I cannot, and will not, tolerate, is the disrespectful tone and communication from Chelsea throughout this ordeal.  Chelsea has spoken to me disrespectfully and the tone in her emails, which she has copied to you all, feel like she's scolding me.  This isn't the first time I've experienced this with her, and I've raised this concern previously with some of you.  I also feel like she's twisting my words and trying to paint me negatively by implying things that I have not said.
>
> While I'm willing to defer to the leadership on business practices, I refuse to endure ongoing disrespect from Chelsea and it's starting to feel like this behavior is being endorsed by you all.
>
> So what I'm asking for is a formal write-up of my concerns.  Whether you three handle this or if I need to go directly to HR, I want her

39

> formally written up and coached on this issue.  I won't continue to put up with this.  I won't be reprimanded by an office manager.
>
> I look forward to hearing your response on this matter.

[Doc. 1-12 at 1–2].

> On that same day, Mautner replied to Mines's email, stating:
>
> I took everyone else off of this email.  I have reached out to Chelsea's boss, Mike Hattery, I have sent him all the communications/emails on this subject.  Luckily everything that has been discussed was done via email so there can be an objective 3rd party (Mike) who can look it all over and discuss the situation with you directly.  I'm happy to be involved or not in any future conversations on the topic.

[Doc. 1-12 at 1].  Later that same day, Michael Hattery replied to Mautner's email, stating, "Brandon, let me know if you have some time tomorrow after 10:00 am and I'll try to make sure I'm available.  If not, when early next week would work?"  [*Id.*].

According to the Second Amended Complaint, "[a]fter meeting with [Mines] for less than five minutes on February 22, 2024, [Ruth Vaughn] advised [Mines] that Emory Healthcare could not (and would not) investigate his claim because Emory Healthcare employed Ms. Richardson."  [Second Am. Compl. ¶ 118].  Mines alleges that Vaughn "insisted that any investigation must be handled by Emory Healthcare but failed to provide [Mines] any direction as to how to submit his complaint to Emory Healthcare properly."  [*Id.*].  According to the Second Amended Complaint, "Emory's mishandling of [Mines's] complaint against [Richardson] was

40

symptomatic of a more significant issue at Emory – a reminder of the 'place' designated for a Black man, circumscribed by unwritten rules rooted in a history of exclusion and discrimination." [*Id.* ¶ 119 (emphasis omitted)]. Mines alleges that his "complaint was ignored, and he was chastised for referring to Ms. Richardson as an 'office manager' and informed by Mike Hattery that he should consider Ms. Richardson, a white woman and non-physician office administrator—as an 'equal.'" [*Id.* (emphasis omitted)].

According to the Amended Complaint, "[d]espite [Mines's] repeated efforts to seek support from Emory's DEI department, Emory repeatedly refused to investigate, demonstrating their direct knowledge of and complicity in maintaining a racially discriminatory and retaliatory environment." [SAC ¶ 120].

### v.    March 2024 Amended EEOC Charge

On March 11, 2024, Mines amended his EEOC Charge to add the Falcons, Boden, and Mautner as respondents and to add claims for retaliation. [SAC ¶ 18; Doc. 1-3]. On May 3, 2024, the EEOC issued a Notice of Right to Sue to Mines. [SAC ¶ 19; Doc. 1-4].

### f.    Mines Resigns his Employment

On April 26, 2024, Mines submitted a notice of resignation from Emory, stating that he was resigning effective May 3, 2024. [SAC ¶ 121]. Mines states that

41

he "provided only one week's notice to allow for a seamless transition for patients and the professional sports teams." [*Id.*]. Mines sent his resignation notice to Boden, Mautner, and Xerogeanes, and that notice stated:

> I write to you this morning with both frustration and relief. It's a challenging moment, as I have decided to resign from Emory. Next Friday will be my last day, and if it weren't for patient and athlete safety, my resignation would be effective immediately.
>
> Entering this role, I was committed to creating meaningful change. In striving for that goal, I've dedicated myself wholly to Emory's mission. However, such dedication has been continuously overshadowed by systemic discrimination within the institution. Specifically, the undeniable fact that, as a Black man, it appears that one's skin color can unjustly impact professional recognition and advancement.
>
> My tenure here has been marred by experiences that have left me deeply unsettled. Despite my focus on excellence, it's been made painfully apparent that my race plays a more significant role here than merit. In the past year alone, overt acts of racism have called my qualifications and competency into question, while treating me differently, and with less respect, than my white colleagues.
>
> When I raised issues about racial injustice, the response was disheartening. My informal and formal complaints seemingly disappeared, unaddressed. This consistent negligence, despite nearly two decades with Emory, signals a lack of support and respect for me as a professional and an individual. Moreover, the stress of ongoing discrimination and retaliation has had severe repercussions, extending beyond professional life into personal struggles with health and familial relationships.
>
> The recent situation involving the [Falcons] exemplifies a climax of these issues. The experience was not only professionally demeaning but also had ramifications on my well-being, leading to physical, emotional, and matrimonial distress.

42

My decision to resign transcends personal grievance.  It is predicated on principle—rejecting a system that overlooks racial discrimination.  I depart with the hope that my resignation might prompt Emory to effectuate meaningful change for future Black doctors and professionals.

Leaving after nearly 20 years signifies more than a job change; it means standing up against persistent racial injustices.  My departure underscores the imperative for a fair and supportive work environment, which I find absent here.

After repeatedly complaining about race discrimination, it's clear that Emory is not going to change, so I must prioritize my health and my family's well-being over continued association with an institution that refuses to change.  I will no longer bring value to an organization that does not value me.

[Doc. 1-13].

According to the Second Amended Complaint, Mines resigned "after enduring 12 months of severe and pervasive discrimination and retaliation."  [SAC ¶ 121].  Mines alleges that he "had reached his breaking point and felt he had no choice," stating that his "work environment at Emory had become so intolerable that he felt compelled to resign to avoid further discrimination, retaliation, defamation, and emotional harm."  [*Id.* ¶ 122].  According to the Second Amended Complaint, Mines "complained and repeatedly voiced his feelings of extreme concern and unsafety to Emory's internal investigation team, pointing out that the racially

discriminatory comments from his colleagues and supervisors had created a toxic working environment." [*Id.* ¶ 123].

Mines alleges that he complained "half a dozen times" over twelve months "about his personal experience of racial discrimination, and despite all of his complaints, which were explicitly about discriminatory treatment, not a single complaint was thoroughly investigated, nor did Emory make any tangible effort to remediate the professional and emotional harm [Mines] was suffering." [SAC ¶ 124]. According to the Second Amended Complaint, "[t]he ongoing and incessant nature of these discriminatory and retaliatory experiences, combined with an overall sense of unsafety within the Emory culture, resulted in a racially hostile work environment where [Mines's] identity as a Black man was continually undermined and ignored." [*Id.* ¶ 125]. Mines alleges that "Emory made it abundantly clear by failing to properly investigate, evaluate or remediate [Mines's] multiple claims of discrimination and retaliation that Emory could not (or would not) ensure a safe environment devoid of discriminatory treatment and retaliatory conduct." [*Id.* ¶ 126].

### g.    Events Following Mines's Resignation

Mines alleges that "only a few hours" after he submitted his resignation letter, Boden responded:

> While we vehemently disagree with your allegations, including those of racism and race discrimination, we are sorry to see you go. We do accept your decision to resign your employment, faculty appointment and associated medical staff privileges. The team will begin the out-boarding process immediately.

[SAC ¶ 127 (emphasis and footnote omitted)]. According to the Second Amended Complaint, "Boden's response to [Mines's] April 26 email set the tone from the top about how [Mines] would be treated during his last week with Emory." [*Id.* ¶ 128].

Mines alleges that Emory allowed Richardson "to announce [Mines's] departure in a sterile and curt email, devoid of any personal sentiment or acknowledgment of [Mines's] 20-year contribution to the practice, which created an aura of impropriety around [Mines's] departure." [SAC ¶ 129]. On April 29, 2024, Richardson sent an email stating:

> It is with regret that we inform you that Dr. Mines has chosen to leave Emory Healthcare, effective this Friday, May 3. We appreciate all Dr. Mines has done for Emory Sports Medicine over the years. Please join us in wishing him the best in his next endeavors, as he will certainly be missed. The team is working to contact patients to reschedule them accordingly. If you have specific questions on coordinat[ing] patient care, please reach out to Heather Schmidt. Leaders – please share this email with your teams accordingly.

[*Id.* ¶ 130 (emphasis omitted)].

In contrast, on May 13, 2024, Emory sent an email from the same department about Dr. Diya Sandhu's departure from Emory that Mines claims was much warmer and that included a personal message from Sandhu. [SAC ¶ 132]. Sandhu was not

45

Black. [*Id.*]. Mines alleges "[u]pon information and belief" that Sandhu worked for Emory for less than five years, while Mines worked for Emory for twenty years and for the Falcons for twelve years. [*Id.* ¶ 133]. According to the Second Amended Complaint, "Emory's [] deviation from the standard practice demonstrates the discriminatory and retaliatory animus behind [Richardson's] email and infringes upon [Mines's] right to a respectful exit." [*Id.*]. Mines alleges that Richardson's email "incited baseless speculation regarding the reasons for [Mines's] resignation, thereby inflicting professional damage and emotional distress." [*Id.*].

According to the Second Amended Complaint, "in retaliation for [Mines's] final race complaint and resignation, Emory executed punitive measures by unilaterally altering [Mines's] patient schedule." [SAC ¶ 134]. Mines alleges that Emory removed all new patient visits from his schedule, which severely reduced his scheduled workload and his anticipated final income. [*Id.*]. According to the Second Amended Complaint, Emory did this "without notice or consultation with [Mines]," and this action "was in stark contrast to Emory's usual practice, and there was no legitimate, non-discriminatory reason for treating [Mines] differently than his non-Black colleagues." [*Id.* ¶ 135]. Mines alleges that "Emory's action to preemptively cancel [Mines's] existing appointments and block all new patient appointments was discriminatory and retaliatory." [*Id.* ¶ 136]. According to Mines, Emory's action

46

had immediate financial repercussions, ensuring that Mines's "final paycheck would not reflect his total earning capacity." [*Id.*].

According to the Second Amended Complaint, Mines's "alleged 'offboarding' during his final week of employment with Emory was characterized by a marked departure from established protocol and was designed to penalize [Mines] for calling out systemic racism in his resignation email." [SAC ¶ 137]. Mines alleges that the departure from established protocol "constituted a clear act of retaliation." [*Id.*]. According to the Second Amended Complaint, "[b]y stripping [Mines] of the customary courtesies and professional respects typically afforded to departing physicians, Emory has not only breached the standard professional practices but also willfully caused [Mines] financial and reputational damage." [*Id.* ¶ 138].

### 6.    Compensation

Mines alleges that under the 2019 Agreement, the Falcons agreed to pay Mines "for all time expended in the performance of those services by [Mines] in semi-monthly installments." [SAC ¶ 139 (footnote omitted)]. Mines states that the Falcons agreed to pay Emory for Mines's services beginning February 10, 2022, and ending the later of February 10, 2023, or the day after the Falcons' last regular or postseason game during the 2022 season. [*Id.*]. According to the Second Amended

47

Complaint, because Mines was an Emory employee, the standard practice was for the Falcons to pay Emory and for Emory to then compensate Mines for the services that Mines performed for the Falcons. [*Id.* ¶ 140].

Mines states that he continued providing medical care to Falcons players after the 2019 Agreement expired because he thought that Emory and the Falcons would renew his contract. [SAC ¶ 141]. Mines provided services to the Falcons until May 11, 2023, when the Falcons removed him from the Head Team Medical Physician position. [*Id.* ¶ 142].

Mines received his final paycheck from Emory on May 28, 2024. [SAC ¶ 143]. According to the Second Amended Complaint, neither the Falcons nor the Emory Defendants have compensated Mines for professional and medical services that he provided to the Falcons players from February 10, 2023, to May 11, 2023. [*Id.* ¶ 144].

### 7.    Alleged Harm

Mines alleges that Defendants "took intentional steps to isolate, retaliate, and marginalize [Mines] that were professionally damaging and personally demoralizing," and "[a]s a direct and proximate result of these practices, [Mines] experienced not only professional setbacks – having his growth stymied, his competencies questioned, and his role diminished – but also experienced immense

personal hardships." [SAC ¶ 145]. According to the Second Amended Complaint, "[t]he public humiliation and professional degradation [Mines] suffered from the unwarranted termination after 12 committed years supporting the [Falcons], the pervasive discriminatory and retaliatory treatment from his colleagues and supervisors at Emory, and his ultimate termination after nearly 20 years of employment at Emory, ha[ve] had severe emotional, professional, reputational, and marital repercussions." [*Id.* ¶ 146].

Mines alleges that "[t]he psychological toll exacted by the stresses of working within a discriminatory, retaliatory, and hostile environment caused and continues to cause sleepless nights, migraines, anxiety, and stress-induced high blood pressure." [SAC ¶ 147]. Mines states that "the stress of race discrimination and retaliation [that he] experienced has resulted in negative impacts on [his] home life and marital relationship." [*Id.* ¶ 147]. Mines alleges that he is entitled to recover damages for this harm. [*Id.* ¶ 148].

According to the Second Amended Complaint, the Falcons "conspired with" the Emory Defendants and Boden "to breach [Mines's] employment agreement." [SAC ¶ 149]. Mines alleges that the Falcons "aided and abetted Emory, [Boden], and [Mautner] to racially discriminate against [Mines] and retaliate and defame [Mines]." [*Id.*]. According to the Second Amended Complaint, the Falcons

"accepted the valuable benefits of [Mines's] stellar medical care and support of their players for over three months without compensating [Mines] for the services provided." [*Id.* ¶ 150]. Mines alleges that he is entitled to recover damages for defamation and breach of contract from the Falcons, or, alternatively, he is entitled to recover under the theories of unjust enrichment and quantum meruit. [*Id.* ¶ 151].

### B.   Procedural Background

As noted above, the Second Amended Complaint asserts thirteen claims. Through the two motions to dismiss, the Defendants seek dismissal of all the claims against them, except for the state-law defamation claim in Count Nine. Specifically, the Falcons seek to dismiss Counts Two, Five, Twelve, and Thirteen, and the remaining Defendants (i.e., the three Emory Defendants and the two individuals) seek to dismiss Counts One through Eight, Count Ten, and Count Eleven. The parties have fully briefed the motions. [Docs. 56, 61, 63 (Falcons' Motion to Dismiss); Docs. 57, 62, 64 (Emory Defendants' Motion to Dismiss)]. For the reasons below, I will recommend that both motions be granted.

### II.   LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows the Court to dismiss a complaint, or portions thereof, for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When reviewing a motion to dismiss, the Court

must take the allegations of the complaint as true and must construe those allegations in the light most favorable to the plaintiff. *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (per curiam). Although a court is required to accept well-pleaded facts as true and make reasonable inferences in favor of the plaintiff, it need not accept the plaintiff's legal conclusions or unwarranted deductions of fact. *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012) (per curiam) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1320 (11th Cir. 2006); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (per curiam).

A court may dismiss a complaint if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Chandler*, 695 F.3d at 1199 (internal quotation marks and citation omitted). In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court stated that a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Although factual allegations in a complaint need not be detailed, those allegations "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations and footnote omitted).

Moreover, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  The mere possibility that the defendant might have acted unlawfully is insufficient to allow a claim to survive a motion to dismiss.  *Id.*  Instead, the well-pleaded allegations of the complaint must move the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.  But the factual allegations in a complaint can be sufficient to survive a motion to dismiss even though recovery may be remote or unlikely.  *Id.* at 555–56. As long as the facts alleged create a reasonable expectation that discovery will reveal evidence of the necessary elements, the plaintiff's suit should continue.  *Id.* at 556.

### III.   THE FALCONS' MOTION TO DISMISS

Mines raises two federal claims and three state law claims against the Falcons. He asserts federal claims under Section 1981 in Count Two (race discrimination) and Count Five (retaliation).  He asserts state claims in Count Nine (defamation), Count Twelve (breach of contract), and Count Thirteen (unjust enrichment/quantum meruit).  [Doc. 56 at 2].  In their motion to dismiss, the Falcons move to dismiss all claims against them in the Second Amended Complaint, other than the defamation claim in Count Nine.

52

### A.   Federal Claims

#### 1.   Section 1981 Race Discrimination Claim (Count Two)

In his Section 1981 race discrimination claim against the Falcons, Mines alleges that the Falcons: (1) "intentionally discriminated against [Mines] on the basis of his race" [SAC ¶ 172], (2) "subjected [Mines] to retention practices and/or termination decisions that were racially motivated" [*id.* ¶ 174], (3) "intentionally discriminated against [Mines] by subjecting him to disparate terms and conditions of employment, including but not limited to, lack of opportunity and harm to his professional reputation relative to his white peers" [*id.* ¶ 175], (4) "intentionally discriminated against [Mines] when fostering a retaliatory, hostile work environment leading to [Mines's] constructive discharge from his employment with the Emory Defendants" [*id.* ¶ 176], (5) "intentionally discriminated against [Mines] when subjecting him to unequal compensation relative to his white peers" [*id.* ¶ 177], and (6) acting in concert with the Emory Defendants, "deprived [Mines] of the right to make, enforce, and enter into contracts and the ability to provide medical services to the [Falcons] players solely because of his race as an African American" [*id.* ¶ 181].

#### *Legal Standard*

Section 1981(a) provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and

enforce contracts . . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a). "[T]he term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). "It is well-settled law that § 1981 prohibits race discrimination in both the public and private employment context." *White v. Crystal Mover Servs., Inc.*, No. 1:14-cv-3202-ELR-JSA, 2016 WL 8787057, at *13 (N.D. Ga. Jan. 26, 2016), *adopted by* 2016 WL 9065878 (N.D. Ga. Mar. 14, 2016) (Ross, J.), *aff'd*, 675 F. App'x 913 (11th Cir. 2017) (per curiam). Courts apply the same analytical framework when addressing claims of discrimination under Title VII and Section 1981. *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009).

"Where § 1981 is used as a remedy for employment discrimination, the elements required to establish a claim under § 1981 mirror those required for a Title VII claim." *Quach v. Paragon Sys. Inc.*, No. 1:15-cv-750-RWS-RGV, 2015 WL 13719674, at *8 (N.D. Ga. Oct. 28, 2015). Although a plaintiff "need not establish a prima facie case [of discrimination] to survive [a] motion to dismiss, it is useful for guidance purposes to note the prima facie formulations that the courts have developed." *Woods v. Lockheed Martin Corp.*, No. 1:18-cv-3501-SDG-CCB, 2020

WL 11884822, at *5 (N.D. Ga. July 10, 2020) (internal citation omitted), *adopted by* 2020 WL 11884829 (N.D. Ga. Sept. 29, 2020), *aff'd*, No. 21-13882, 2022 WL 2972852 (11th Cir. Jul. 27, 2022).  To establish a prima facie case of employment discrimination under Section 1981, a plaintiff must plead, and ultimately show that "1) []he is a member of a protected class; 2) []he was qualified for the position; 3) []he suffered an adverse employment action; and 4) []he was replaced by someone outside [his] protected class or was treated less favorably than a similarly-situated individual outside [his] protected class." *Phillips v. City of Atlanta*, No. 1:15-cv-3616-TWT-RGV, 2016 WL 5429668, at *8 (N.D. Ga. July 29, 2016) (internal quotation marks and citation omitted), *adopted by* 2016 WL 5394116 (N.D. Ga. Sept. 27, 2016).

Further, to prevail on a Section 1981 race discrimination claim, "a plaintiff must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020).  "The plaintiff may not rely on a motivating factor theory." *Scott v. Harris*, No. 2:20-cv-596-ECM, 2022 WL 2161493, at *3 (M.D. Ala. June 15, 2022) (internal quotation marks and citation omitted); *see also Wills v. Walmart Assocs., Inc.*, 592 F. Supp. 3d 1203, 1258 (S.D. Fla. 2022) (noting that "[a] plaintiff pursuing a § 1981 claim must prove but-for

55

causation"). To satisfy this standard at the pleading stage, a plaintiff must "provide enough factual matter to plausibly suggest intentional discrimination," which requires pleading "sufficient facts to plausibly suggest discrimination under the but-for causation standard." *Scott*, 2022 WL 2161493, at *4 (internal quotation marks and citations omitted). "To [plead] but-for causation, [a plaintiff] must plausibly allege that racial animus had a 'determinative influence' on the [defendant's] adverse employment actions." *Id.* (quoting *Ziyadat v. Diamondrock Hosp. Co.*, 3 F.4th 1291, 1297–98 (11th Cir. 2021)).

### Claims Relating to Mines's Employment With Emory

Mines appears to seek to hold the Falcons responsible for claims relating to Mines's employment with Emory. Mines alleges that the Falcons "intentionally discriminated against him by": (1) "subjecting [him] to disparate terms and conditions of employment, including but not limited to, lack of opportunity and harm to his professional reputation relative to his white peers" [SAC ¶ 175], (2) "fostering a retaliatory, hostile work environment leading to [Mines's] constructive discharge from his employment with the Emory Defendants" [*id.* ¶ 176], and (3) "subjecting him to unequal compensation relative to his white peers" [*id.* ¶ 177]. As the Falcons point out, each of those allegations relates to Mines's employment with Emory, and

56

Mines has not pled facts suggesting that the Falcons could possibly be considered a joint employer with Emory. [Doc. 56 at 8–12 & n.8; *see generally* SAC].

Nor has Mines pled facts suggesting that the Falcons acted jointly with the Emory Defendants to affect the conditions and terms of Mines's employment with Emory. Mines alleges that the Falcons acted "in concert" with or "conspired with" the Emory Defendants, and he claims that the Falcons "aided and abetted [the Emory Defendants and Boden] to racially discriminate against" him. [SAC ¶¶ 149, 181 (adding in Mautner to a similar allegation)]. Those allegations are legal conclusions, and they must be disregarded. *See Howard v. MHT USA LLC*, No. No. 1:21-cv-4570-CAP-RGV, 2022 WL 2389277, at *8 (N.D. Ga. May 2, 2022) (disregarding legal conclusions in a complaint), *adopted by* 2022 WL 18777356 (N.D. Ga. May 18, 2022). Mines has not pled facts to support the allegations, and he thus fails to state a plausible claim against the Falcons relating to his employment with Emory. Mines's Section 1981 discrimination claims against the Falcons for (1) allegedly subjecting him to "disparate terms and conditions of employment" [SAC ¶ 175], (2) "fostering a retaliatory, hostile work environment leading to [Mines's] constructive discharge from his employment with the Emory Defendants" [*id.* ¶ 176], and (3)

"subjecting him to unequal compensation relative to his white peers" [*id.* ¶ 177], should be dismissed.[5]

### *Demotion Claim*

Mines also alleges that the Falcons discriminated against him based on his race by "demoting him" when the Falcons added Hill to the 2023 Agreement. [SAC ¶¶ 50–51, 58–66]. The language of the 2023 Agreement, however, did not reflect that Mines was demoted. Rather, the 2023 Agreement states that Mines and Hill were both to serve as "Primary Care Sports Medicine Specialists." [Doc. 1-6 at 1]. Moreover, Boden informed Mines that his "team title has always been Head Team Medical and it will not change for the 2023 Season." [Doc. 1-8 at 1]. Mines does not allege that his title ever changed or that his duties changed as a result of the new contract. Thus, Mines has not plausibly alleged that he was demoted.

Moreover, even if there was a demotion, Mines has not pled facts showing that the Falcons' decision to add Hill to the contract was based on race. Mines

---

[5] Regarding compensation, the 2019 and 2023 Agreements stated that the Falcons would pay Emory for the services that Emory's physicians provided, and Emory, in turn, would determine how to distribute those payments to its physicians. [Doc. 1-5 at 8, 14; Doc. 1-6 at 8, 13]. Mines has not pled facts suggesting that the Falcons played any role in Emory's decisions about distributing the payments. Mines, therefore, fails to state a plausible Section 1981 discrimination claim against the Falcons relating to his compensation.

simply alleges, in conclusory terms, that Hill was a less-qualified and less-experienced white physician. [SAC ¶¶ 62, 78, 218]. Mines, however, has not pled facts that would allow the Court to infer that intentional race discrimination motivated the Falcons' decision to add Hill to the 2023 Agreement. *See Woods v. Lockheed Martin Corp.*, No. 1:18-cv-3501-LMM-CCB, 2019 WL 13078822, at *6 (N.D. Ga. June 27, 2019) (recommending dismissal of a plaintiff's disparate treatment claim where the plaintiff alleged that she was demoted and replaced by four people who had less experience and were less capable, because the plaintiff failed to, among other things, provide other factual allegations suggesting that her demotion was due to race or sex discrimination), *adopted in part by* 2019 WL 13078831 (N.D. Ga. Sept. 4, 2019), *aff'd*, No. 21-13882, 2022 WL 2972852 (11th Cir. July 27, 2022). Without pleading facts that would allow the Court to infer that the decision was based on intentional race discrimination, this is not enough to state a plausible Section 1981 discrimination claim. *See Phillips*, 2016 WL 5429668, at *9 (recommending dismissal of a Section 1981 claim that alleged that White employees did not experience the same treatment but did not allege enough facts to show intentional discrimination). Mines includes the phrase "because of" in some parts of the SAC, but this does not satisfy his burden to plead causation. The fact that Mines's allegations may be "consistent with intentional race discrimination, and

59

may support a suspicion or possibility of misconduct" is not enough to show intentional discrimination. *Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1354 (N.D. Ga. 2017) (internal quotation marks omitted).

In short, Mines's demotion claim relating to the decision to add Hill to the 2023 Agreement rests on Mines's contention that he was more qualified than Hill and that the contract should have specified that he was the sole Head Team Medical Physician. The Court, however, does "'not sit as a super-personnel department that reexamines an entity's business decisions.'" *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)). It is not the Court's "role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010); *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999) ("We are not in the business of adjudging whether employment decisions are prudent or fair."). Having not alleged facts showing that intentional race-based discrimination motivated the Falcons' decision to add Hill to the 2023 Agreement, Mines has not pled a plausible claim based on this decision, and the Court cannot second-guess the decision.

*Termination Claim*

Mines also contends that the Falcons discriminated against him based on his race by terminating him from his position as the Head Team Medical Physician. To support this claim, Mines alleges:

(1)  His "termination [was] devoid of any substantive explanation or valid cause." [SAC ¶ 5].

(2)  his termination "raised serious questions about fairness, equality, and unlawful racial bias" and was "unlawful." [*Id.* ¶ 6].

(3)  The Falcons engaged in "malicious discrimination" and "discriminatory practices." [*Id.* ¶ 7].

(4)  Mines was "summarily terminated from [his] high-profile role in the NFL without any forewarning or discussion," and "[t]o the extent that there were legitimate concerns with his performance, [Mines] was not afforded the same opportunity to cure or remediate those issues as his white counterparts." [*Id.* ¶ 77].

(5)  "Emory and the [Falcons'] discriminatory and retaliatory motivations for [Mines's] termination were even more suspect, considering he was replaced by [Hill], a less experienced and less qualified white male physician." [*Id.* ¶ 78].

(6)  The Falcons and the Emory Defendants "took intentional steps to isolate, retaliate [against], and marginalize [Mines] that were professionally damaging and personally demoralizing." [*Id.* ¶ 145].

(7)  The Falcons "conspired with" the Emory Defendants to breach Mines's employment agreement, and they "aided and abetted" the Emory Defendants "to racially discriminate against" Mines. [*Id.* ¶ 149].

(8)  The Defendants (including the Falcons) subjected Mines "to retention practices and/or termination decisions that were racially motivated." [*Id.* ¶ 174].

(9) The Falcons, "acting in concert" with the Emory Defendants, "deprived [Mines] of the right to make, enforce, and enter into contracts and the ability to provide medical services to the [Falcons] players solely because of his race as an African American." [*Id.* ¶ 181].

All of those allegations are conclusory and must be disregarded. Without facts that would allow the Court to infer that the decision to terminate him as the Head Team Medical Physician was based on intentional race discrimination, Mines fails to plead a plausible Section 1981 discrimination claim based on his termination. *Woods*, 2019 WL 13078822, at *6.

Mines alleges, "[u]pon information and belief," that "there have been other instances when white physicians transitioned from the [Falcons] and were not treated in the same manner." [SAC ¶ 66]. Mines also alleges, "[u]pon information and belief," that the Falcons, Emory, and Boden were "upset with [Mines] and treated him with disdain because he told the NFL about the 2023 Agreement's non-compliance with the NFL collective bargaining agreement," and "as a result, Emory and the [Falcons] continued negotiating the 2023 Agreement after [Mines] had already executed [it] with the express goal of terminating [Mines] from his position." [*Id.* ¶ 58]. The Court, however, "need not accept as true any allegations based merely upon information and belief." *Howard*, 2022 WL 2389277, at *7; *see also Midway Ins. Mgmt. Int'l, Inc. v. Accident Ins. Co.*, No. 1:20-cv-1481-TCB, 2021 WL 4815890, at *12 (N.D. Ga. Mar. 11, 2021) ("As the Eleventh Circuit has held, the

Court need not accept averments based 'on information and belief' as true when the allegations are conclusory and there are no corresponding facts to support them."). Here, Mines has pled no facts to support these "[u]pon information and belief" allegations, and the allegations must be disregarded. *Howard*, 2022 WL 2389227, at *7; *Midway Ins. Mgmt. Int'l, Inc.*, 2021 WL 4815890, at *12.[6]

Nor has Mines pled facts that would allow the Court to infer discriminatory intent based on the Falcons' treatment of other providers. Although Mines alleges that a white male physician, Spero Karas, was given "ample warning and opportunity to resolve any issues" and "was permitted to resign from this role with dignity," Mines pleads no facts to show that the situation with Karas situation was like his. This allegation, standing alone, is not enough to allow the Court to infer that intentional race discrimination was the but-for cause for the decision to terminate Mines's contract. *Henley*, 267 F. Supp. 3d at 1354; *see also Phillips*, 2016 WL 5429668, at *9 (recommending dismissal of a Section 1981 claim that alleged that white employees did not experience the same treatment but did not allege enough facts to show intentional discrimination).

---

[6] These allegations are also conclusory.

In his response to the motion to dismiss, Mines argues that he "alleges a continuing pattern of race discrimination by the [Falcons] that could be considered circumstantial evidence of discriminatory intent." [Doc. 61 at 7–8]. The problem with this argument is that it relies on conclusory allegations. [*Id.*]. Mines pleads no facts that would allow the Court to infer that a continuing pattern of race discrimination existed. Even if Mines had pled facts, he could not have supported a claim against the Falcons based on a pattern and practice theory, because such a claim cannot be based on a single incident or isolated incidents. *See Henley*, 267 F. Supp. 3d at 1360 (finding that even if the plaintiffs' allegations plausibly suggested racially-discriminatory animus against an African-American employee who applied for a position, the allegations were "insufficient to support a pattern and practice claim against the Defendants named because they allege[d] only a single incident of plausible discrimination"); *see also E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1286–87 (11th Cir. 2000) (noting that a pattern and practice claim requires "more than the mere occurrence of isolated or accidental or sporadic discriminatory acts," and the party asserting such a claim must establish that "discrimination [is] the company's standard operating procedure—the regular rather than unusual practice") (alteration in original) (internal quotation marks and citation omitted).

64

In short, Mines has not pled a Section 1981 discrimination claim against the Falcons based on the decision to terminate him from the Head Team Medical Physician position.  The motion to dismiss should be granted as to this claim.

### 2.    Section 1981 Retaliation (Count Five)

Mines also asserts a Section 1981 retaliation claim against the Falcons.  [SAC ¶¶ 217–27].  A plaintiff asserting a retaliation claim under Section 1981 must allege "(1) statutorily protected activity, (2) a materially adverse action, and (3) a causal connection between the protected activity and the materially adverse action." *Swindle v. Jefferson Cnty. Comm'n*, 593 F. App'x 919, 926 (11th Cir. 2014) (per curiam).  For purposes of a Section 1981 retaliation claim, "[m]aterially adverse actions are those that might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Smith v. City of Fort Pierce, Fla.*, 565 F. App'x 774, 777–78 (11th Cir. 2014) (per curiam) (internal quotation marks omitted).  A plaintiff asserting a Section 1981 retaliation claim also must establish but-for causation. *Powe v. Farmers Ins. Exch.*, 667 F. Supp. 3d 1227, 1244 (N.D. Ga. 2023).

Here, Mines has not pled a plausible Section 1981 retaliation claim against the Falcons.  Mines alleges:

(1) The Falcons were "upset with [Mines] and treated him with disdain because he told the NFL about the 2023 Agreement's non-compliance with the NFL collective bargaining agreement," and they continued negotiating the 2023

Agreement after Mines executed it "with the express goal of terminating [Mines] from his position." [SAC ¶ 58].

(2) "Upon information and belief, [the Falcons] terminated [Mines's] contract in retaliation because he questioned the 2023 Agreement's compliance with the NFL's 2020 CBA and because [Mines] dared to question Boden, Emory, and the [Falcons] about unfairly demoting him by requiring him to share his hard-earned role with [Hill], a less experienced white man." [*Id.* ¶ 62].

(3) The "retaliatory motives for [Mines's] termination were even more suspect, considering he was replaced by [Hill] a less experienced and less qualified white male physician." [*Id.* ¶ 78].

(4) The Falcons "took intentional steps to isolate, retaliate, and marginalize [Mines] that were professionally damaging and professionally demoralizing." [*Id.* ¶ 145].

(5) The Falcons "conspired with [the Emory Defendants] to breach [Mines's] employment agreement" and "aided and abetted [the Emory Defendants] to racially discriminate against [Mines] and retaliate and defame [Mines]." [*Id.* ¶ 149].

(6) "Upon information and belief, [the Falcons] terminated [Mines's] contract in retaliation because he questioned the 2023 Agreement's compliance with the NFL's 2020 CBA and because [Mines] dared to question [them] about unfairly discriminating against him by requiring him to share his hard-earned role with [Hill], a less experienced white man." [*Id.* ¶ 218].

(7) Mines (1) "opposed [Defendants'] racially discriminatory behavior on multiple occasions, which he reasonably believed violated his rights under Section 1981" [*Id.* ¶ 220], and (2) "engaged in a protected activity by reporting race discrimination to the Emory Defendants' internal DEI department, reporting race discrimination to supervisors, and filing a Charge with the EEOC" [*Id.* ¶ 222].

All of these allegations are conclusory and must be disregarded. Mines has pled no facts to support his Section 1981 retaliation claim against the Falcons, and the claim should be dismissed.

Mines also fails to allege that he engaged in protected conduct. "'A complaint about an employment practice constitutes protected opposition only if the individual explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination.'" *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010) (per curiam) (quoting EEOC Compl. Man. (CCH) §§ 8-II-B(2) (2006)); *see also Wheatfall v. Bd. of Regents of Univ. Sys. of Ga.*, 9 F. Supp. 3d 1342, 1353 (N.D. Ga. 2014) (noting that the employee's complaint "must have put [his employer] on notice that []he was opposing a practice made unlawful by Title VII"). "Mere complaints about work and vague or ambiguous protests do not constitute protected activity within the meaning of Title VII [or Section 1981] if a reasonable employer would not understand those communications to be opposition to discriminatory conduct." *Tarver v. S. Def. Sys., Inc.*, No. CV-07-BE-1570-E, 2009 WL 10703401, at *13 (N.D. Ala. Feb. 24, 2009). "The words or actions of the employee must reveal a clear and unambiguous attempt to oppose conduct that []he believes violates Title VII [or Section 1981]." *Id.*

Mines alleges that the Falcons terminated his contract based in part on his complaints that the 2023 Agreement failed to comply with the 2020 CBA. [SAC ¶¶ 62, 218]. This is not a complaint about an unlawful employment practice or race discrimination, and it is not protected conduct for purposes of a Section 1981 retaliation claim. *Murphy*, 383 F. App'x at 918; *Wheatfall*, 9 F. Supp. 3d at 1353.

Mines also alleges that the Falcons terminated his contract based on his complaints about being replaced by Hill, a white physician who was purportedly less experienced and less qualified. [SAC ¶¶ 52, 62, 218]. "[T]o constitute statutorily protected activity capable of supporting a § 1981 retaliation claim, an employee's complaint must reasonably convey that []he is opposing discrimination based specifically upon race, versus some other type of discrimination or injustice generally." *Cochran v. S. Co.*, No. 14-0569-WS-N, 2015 WL 3508018, at *2 (S.D. Ala. June 3, 2015) (internal quotation marks and citation omitted). If a plaintiff "did not complain about adverse treatment on the basis of race, then []he did not engage in protected activity for purposes of § 1981." *Id.*

Here, although Mines alleges that he complained to Boden about race discrimination with regard to having to share his Head Team Medical Physician role with Hill, the exhibits attached to the Second Amended Complaint contradict those allegations and show that Mines did not complain to Boden about race

discrimination. *See generally* [Doc. 1-7; Doc. 1-8; Doc. 1-9]. The exhibits are controlling. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls. The classic example is when a plaintiff attaches a document to his complaint but his allegations about what the document is or says contradict the document itself."); *Hays v. Page Perry, LLC*, 92 F. Supp. 3d 1315, 1322 n.47 (N.D. Ga. 2015) ("Although the Plaintiff alleges otherwise in his Complaint, the attached exhibits expressly contradict these allegations. And 'when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.'") (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007)), *aff'd*, 627 F. App'x 892 (11th Cir. 2015) (per curiam). The exhibits demonstrate that Mines never mentioned race discrimination in his complaints to Boden. *See generally* [Doc. 1-7; Doc. 1-8; Doc. 1-9]. Instead, Mines was concerned about the loss of prestige and other incentives relating to the 2023 Agreement. *See generally* [Doc. 1-7; Doc. 1-8; Doc. 1-9]. Those complaints do not constitute protected activity under Section 1981, and Mines fails to plead a plausible Section 1981 retaliation claim based on the complaints. *Murphy*, 383 F. App'x at 918; *Wheatfall*, 9 F. Supp. 3d at 1353.

Moreover, Mines has pled no facts suggesting that the Falcons were aware that Mines engaged in other allegedly protected activity, including reporting race discrimination to Emory's DEI department, complaining of race discrimination to his supervisors, and filing an EEOC Charge. *See generally* [SAC]. The allegations of the Second Amended Complaint show that those activities occurred *after* the Falcons terminated Mines as their Head Team Medical Physician, and Mines pleads no facts suggesting that the Falcons were aware of this conduct. Mines, therefore, cannot state a Section 1981 retaliation claim against the Falcons based on this conduct. *See Canty v. Fry's Electronics, Inc.*, No. 1:09-cv-3508-WSD, 2012 WL 1038611, at *5 (N.D. Ga. Mar. 27, 2012) (finding that a plaintiff failed to establish a causal connection between his filing of an EEOC charge and an adverse employment action because the defendants "did not know of his statutorily-protected EEOC activity"); *see also Counts v. DeJoy*, No. 8:22-cv-669-TPB-CPT, 2022 WL 2806826, at *4 (M.D. Fla. June 30, 2022) (noting that a plaintiff had not alleged a causal connection between his protected activity and alleged harassment by management where the plaintiff's allegations stated that the complaint occurred after the alleged adverse action), *adopted by* 2022 WL 2802885 (M.D. Fla. July 18, 2022).

For the above reasons, Mines has not pled a plausible Section 1981 retaliation claim against the Falcons.  Count Five of the Second Amended Complaint, therefore, should be dismissed.

### B.    State Law Claims

If the district judge agrees with my assessment of Mines's federal claims against the Falcons (and, as discussed in Section IV, my assessment of Mines's federal claims against the remaining Defendants), the district judge could exercise discretion under 28 U.S.C. Section 1367(c) and decline to exercise supplemental jurisdiction over Mines's state law claims, including the defamation claim contained in Count Nine.  *See Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 743 (11th Cir. 2006) (noting that a district court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction") (quoting 28 U.S.C. § 1367(c)(3)).  Alternatively, for the reasons below, the district judge should dismiss Mines's state law claims against the Falcons for breach of contract and unjust enrichment or quantum meruit for failure to state a claim for relief.

### 1.    Breach of Contract (Count Twelve)

In Count Twelve, Mines asserts a breach of contract claim against the Falcons based on the alleged failure to pay him for services that he provided to Falcons

71

players from February 10, 2023, to May 22, 2023.  [SAC ¶¶ 320–34].  For the reasons below, Mines has not pled a plausible breach of contract claim against the Falcons.

Under Georgia law, "[a]n action for breach of contract requires breach of a valid contract and resultant damages to the party who has the right to complain about the breach."  *Kabir v. Statebridge Co., LLC*, No. 1:11-cv-2747-WSD, 2011 WL 4500050, at *6 (N.D. Ga. Sept. 27, 2011).  "'[T]he essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom.'"  *Id.* at *7 (quoting *TDS Healthcare Sys. Corp. v. Humana Hosp. Ill., Inc.*, 880 F. Supp. 1572, 1583 (N.D. Ga. 1995)).  "A plaintiff asserting a breach of contract claim must allege a particular contractual provision that the defendants violated to survive a motion to dismiss."  *Id.*

The 2019 Agreement and the 2023 Agreement both contain provisions about compensation.  [Doc. 1-5 at 8; Doc. 1-6 at 8].  The provisions are identical, and they state:

> (a)    <u>Compensation for Personal and Administrative Services to be Provided by Team Physicians.</u>  In exchange for the services provided by the Team Physicians set forth on Exhibits A and B hereto, the Falcons shall pay The Emory Clinic the compensation set forth on Exhibits A and B.  The parties acknowledge and agree that the Falcons shall have no independent obligation to, and shall not, pay Team Physicians directly for the services set forth herein.  The Emory Clinic shall be responsible for the compensation of Team Physicians for their

72

services under this Agreement in accordance with any applicable employment agreements between them and The Emory Clinic, applicable policies of The Emory Clinic and Emory Healthcare, and in full compliance with all applicable federal and state laws and regulations. Each Team Physician shall release and hold the Falcons harmless from and against any failure or refusal by The Emory Clinic to pay or reimburse them for any compensation that may be due and owing to them for services provided pursuant to this Agreement.

(b)    Arrangements for Payment of Medical and Surgical Services. In the event that Team Physician, in the exercise of their independent medical judgment, deem it advisable for any Falcons player or employee to obtain services from an Emory Healthcare medical provider (a hospital facility, clinic or physician) for further medical or surgical treatment that is related to a work injury or illness and such individual is admitted or referred for such treatment, the Falcons agree to pay to Emory Healthcare the specified rates for those medical and surgical services as set forth on Exhibit C, and pursuant to the terms and conditions set forth in Exhibit C. For purposes of Exhibit C, the Falcons are the "Payer" and Emory Healthcare is the "Provider."

[Doc. 1-5 at 8; Doc. 1-6 at 8].

The compensation provisions in the Agreements made clear that Emory, rather than the Falcons, had responsibility for distributing payments to Mines and the other physicians covered by the Agreements. [Doc. 1-5 at 8; Doc. 1-6 at 8]. Moreover, both Agreements expressly barred Mines from holding the Falcons liable for Emory's failure to compensate him for services that he provided under the Agreements. [Doc 1-5 at 8; Doc. 1-6 at 8]. The plain language of the Agreements thus bars Mines's breach of contract claims. Because Mines cannot point to any contractual provision that the Falcons breached, Mines fails to plead a plausible

breach of contract claim against the Falcons. *Am. Cas. Dining, L.P. v. Moe's Sw. Grill, L.L.C.*, 426 F. Supp. 2d 1356, 1369 (N.D. Ga. 2006).

In his response to the motion to dismiss, Mines argues that the Falcons cannot rely on the indemnity clause in the Agreements to shield themselves from liability under the Agreements. [Doc. 61 at 20–21]. This argument misses the mark. The Falcons are not relying on an indemnity provision—that provision is in a different portion of the Agreements. [Doc. 1-5 at 4–5; Doc. 1-6 at 4–5]. Moreover, although Georgia courts have found "that a contract does not indemnify the indemnitee against its own negligence unless it says so," Mines does not assert a negligence claim against the Falcons. *United Parcel Serv., Inc. v. Colt Sec. Agency, Inc.*, 676 S.E.2d 22, 24 (Ga. Ct. App. 2009); *see generally* [SAC]. Thus, Mines's arguments about indemnification are misplaced.

Mines also argues that the Falcons cannot delegate the duty to compensate Mines to the Emory Defendants. [Doc. 61 at 19–20]. The 2019 and 2023 Agreements, however, directly obligated Emory—not the Falcons—to distribute the funds that the Falcons paid to Emory for physicians' work. [Doc. 1-5 at 8; Doc. 1-6 at 8]. This case thus does not present an assignment or delegation issue.

In short, the 2019 and 2023 Agreements did not require the Falcons to compensate Mines. Mines, therefore, fails to state a plausible breach of contract

claim against the Falcons for failure to compensate him. Count Twelve of the Second Amended Complaint should be dismissed.

### 2. Unjust Enrichment and Quantum Meruit (Count Thirteen)

In Count Thirteen, Mines asserts a claim for unjust enrichment and quantum meruit against the Falcons relating to the alleged failure to compensate him for services that he performed for the Falcons from February 2023 through May 11, 2023. [SAC ¶¶ 335–43]. For the reasons below, Mines has not pled a plausible claim for unjust enrichment or quantum meruit.

Under Georgia law, "[t]he theory of unjust enrichment applies when there is no legal contract and when there has been a benefit conferred which would result in an unjust enrichment unless compensated." *Smith Serv. Oil Co. v. Parker*, 549 S.E.2d 485, 487 (Ga. Ct. App. 2001) (internal quotation marks and footnote omitted). "[T]he essential elements of the claim are that (1) a benefit has been conferred, (2) compensation has not been given for receipt of the benefit, and (3) the failure to so compensate would be unjust." *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301, 1309 (N.D. Ga. 2012). "Under Georgia law, to state a claim for quantum meruit, a plaintiff must show '(1) the performance of valuable services; (2) accepted by the recipient or at his request; (3) the failure to compensate the provider would be unjust; and (4) the provider expected compensation at the time services were

75

rendered.'" *Davidson v. Maraj*, 609 F. App'x 994, 997 (11th Cir. 2015) (per curiam) (quoting *Amend v. 485 Props.*, 627 S.E.2d 565, 567 (Ga. 2006)). "The doctrine of unjust enrichment differs from that of quantum meruit in that unjust enrichment does not require [a] plaintiff to show an expectation of compensation; quantum meruit, by comparison, 'relies on an implied promise of compensation.'" *Id.* (quoting *Yoh v. Daniel*, 497 S.E.2d 392, 394–95 (Ga. Ct. App. 1998)).

Neither unjust enrichment nor quantum meruit "is available when an express contract exists governing all the claimed rights and responsibilities of the parties." *Davidson*, 609 F. App'x at 997. "While a party may plead equitable claims in the alternative, the party may only do so if one or more of the parties contests the existence of an express contract governing the subject of the dispute." *Goldstein v. Home Depot U.S.A., Inc.*, 609 F. Supp. 2d 1340, 1347 (N.D. Ga. 2009).

Here, Mines alleges (and the Falcons do not dispute) that the 2019 and 2023 Agreements were valid contracts. *See* [SAC ¶ 321 ("Both the 2019 and 2023 [A]greements were valid and enforceable contracts.")]. The 2019 and 2023 Agreements both contained express provisions governing compensation. [Doc. 1-5 at 8; Doc. 1-6 at 8]. Based on the allegations of the Second Amended Complaint, any benefit that Mines may have conferred on the Falcons "was triggered by provisions of a contract, the validity of which neither side challenges." *Am. Cas.*

*Dining, L.P.*, 426 F. Supp. 2d at 1372.  The Second Amended Complaint, therefore, does not state a plausible claim for unjust enrichment or quantum meruit against the Falcons.  *Id.*; *see also Ga. Realty & Ins. Co. v. Oakland Consol. of Ga., Inc.*, 148 S.E.2d 53, 55 (Ga. Ct. App. 1966) (finding that a complaint "did not state a cause of action for quantum meruit" where the complaint averred that an express contract existed and the pleadings did not "claim value for authorized services over and beyond an express contract").  The motion to dismiss should be granted as to Count Thirteen of the Second Amended Complaint.

## IV.   THE REMAINING DEFENDANTS' MOTION TO DISMISS

The remaining Defendants also moved to dismiss all claims against them in the Second Amended Complaint, other than the defamation claim in Count Nine. [Doc. 57].  Mines filed a response opposing the motion [Doc. 62], and the remaining Defendants filed a reply [Doc. 64].  For the reasons below, I will recommend that the motion be granted.

### A.   Federal Claims

#### 1.   Title VII and Section 1981 Claims (Counts One through Five) Against Emory Healthcare

Emory Healthcare argues that Mines's Title VII and Section 1981 claims against Emory Healthcare fail because Mines has not plausibly alleged that Emory Healthcare was his employer.  [Doc. 57-1 at 6–7].  Mines responds that he alleged

that Emory Healthcare was his employer by alleging that (1) Emory Healthcare is responsible for the actions of its agents, employees, and representatives, including Boden and Mautner, under respondeat superior and vicarious liability [Doc. 62 at 2]; (2) he was an employee of "Emory," which included Emory Healthcare [*id.*]; (3) he submitted complaints to Emory Healthcare [*id.* at 2–3]; (4) Boden's roles with Emory Healthcare "underscore [Emory Healthcare]'s operational authority over [Mines's] employment [*id.* at 3]; and (5) Emory Healthcare drafted the email announcing Mines's departure [*id.*].

Claims under Title VII and Section 1981 must be brought against employers. *See Dearth v. Collins*, 441 F.3d 931, 933 (11th Cir. 2006) ("[R]elief under Title VII is available against only the employer[.]"); *Greason v. Se. R.R. Associated Bureaus*, 650 F. Supp. 1, 3–4 (N.D. Ga. 1986) (noting that a plaintiff asserting a Section 1981 claim must show, among other things, that "he was either terminated from or denied employment by the defendant"). "Consistent with the remedial purposes of Title VII, the federal courts have interpreted the term 'employer' liberally." *Peppers v. Cobb Cnty., Ga.*, 835 F.3d 1289, 1297 (11th Cir. 2016).

Both Title VII and Section 1981 permit liability in joint employer situations. *Virgo v. Riviera Beach Assocs., Ltd.*, 30 F.3d 1350, 1359–60 (11th Cir. 1994) (addressing joint employer liability under Title VII); *Greason*, 650 F. Supp. at 4

(discussing joint employer liability under Section 1981).  Under the "joint employer"

test, two entities may be aggregated if the "entities contract with each other for the

performance of some task, and one [entity] retains sufficient control over the terms

and conditions of employment of the other [entity's] employees."  *Lyes v. City of*

*Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999) (en banc).  In *Peppers*,

the Eleventh Circuit explained that under the "joint employer" test, as framed in the

private employment context, an entity could be aggregated with another if:

> while contracting in good faith with an otherwise independent company, [it] has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.  Thus the joint employer concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the *essential* terms and conditions of employment.

*Peppers*, 835 F.3d at 1300 (quoting *Virgo*, 30 F.3d at 1360) (emphasis in original).

"'The joint employment relationship . . . is employee-specific.'"  *Id.* (quoting

*Sandoval v. City of Boulder, Colo.*, 388 F.3d 1312, 1324 (10th Cir. 2004)).

"Generally, courts examine several factors in analyzing this issue, including

the degree of authority that the one company has in hiring and firing, disciplining,

assigning work to, and supervising the other company's employees."  *Underwood v.*

*Chick-fil-A, Inc.*, No. 1:09-cv-2831-TCB, 2010 WL 11718325, at *2 (N.D. Ga. Aug.

18, 2010); *see also Parker v. Esper*, 856 F. App'x 807, 808 (11th Cir. 2021) (per

curiam) ("In determining whether an entity is a person's employer, we consider whether the employment took place on the alleged employer's premises, how much control the alleged employer asserted, and the extent to which the alleged employer had the power to modify employment conditions."). "[T]he focal point of the inquiry is not which entity controlled the specific aspect of the relationship giving rise to a discrimination claim, but rather which entity or entities controlled the fundamental and essential aspects of the employment relationship when taken as a whole." *Peppers*, 835 F.3d at 1301. "Whichever entity (or entities) predominantly controls the terms of the relationship may be found liable under Title VII." *Id.*

Although a plaintiff "'is not required to conclusively establish that [the] defendants were [his] joint employers at the pleading stage, [the] plaintiff must at least allege *some* facts in support of this legal conclusion.'" *Smith v. CH2M Hill, Inc.*, No. 1:10-cv-2936-CC-RGV, 2011 WL 13128411, at *7 (N.D. Ga. Mar. 3, 2011) (second alteration and emphasis in original) (quoting *Hibbs-Rines v. Seagate Techs., LLC*, No. C 08-05430 SI, 2009 WL 513496, at *5 (N.D. Cal. Mar. 2, 2009)), *adopted by* 2011 WL 13129749 (N.D. Ga. Sept. 1, 2011).

Here, Mines has pled no facts supporting his claim that Emory Healthcare was his employer. Mines claims that he alleges in the introductory paragraph of the Second Amended Complaint that he was an employee of "Emory," collectively

80

defined as Emory Healthcare, the Emory Clinic, and the School of Medicine, but the introductory paragraph contains no such allegation. *See generally* [SAC ¶ 1]. Mines cannot add allegations to the Second Amended Complaint through arguments in his response brief. *See Walker v. SunTrust Bank of Thomasville, Ga.*, No. 7:07-cv-173 (HL), 2008 WL 4004714, at *3 n.1 (M.D. Ga. Aug. 26, 2008) ("[I]t is well-established that a complaint may not be amended by a brief in opposition to a motion to dismiss."), *aff'd*, 363 F. App'x 11 (11th Cir. 2010). Although Mines alleges in paragraph 8 of the Second Amended Complaint that he was an employee of "Emory," this allegation is conclusory and must be disregarded. [SAC ¶ 8]. And, Mines alleges that he signed a contract with the Emory Clinic and the School of Medicine—not that he signed an agreement with Emory Healthcare. [*Id.* ¶ 34].

Moreover, although Mines claims that he alleges in paragraph 9 that Emory Healthcare is responsible for the actions of Boden and Mautner based on respondeat superior and vicarious liability, this allegation is a legal conclusion. [SAC ¶ 9]. Mines pleads no facts suggesting that Emory Healthcare might be responsible for the actions of Boden and Mautner under those standards. Even if he had, respondeat superior and vicarious liability are not the applicable standards for determining whether an entity may be liable as a joint employer under Title VII or Section 1981. *Peppers*, 835 F.3d at 1300. Instead, Mines must plead facts suggesting that Emory

Healthcare retained enough control over the essential terms and conditions of his employment to be considered a joint employer. *Id.*

Mines has failed to meet that pleading burden here. His allegations about submitting complaints to Emory Healthcare's DEI department, the DEI department's investigation of the complaints, and Emory Healthcare's email announcing his resignation are not enough to suggest that Emory Healthcare controlled the essential terms and conditions of his employment. [SAC ¶¶ 18, 116, 120, 129–32, 213, 222, 256, 257, 259]. Moreover, the fact that Boden may serve in roles with the three Emory Defendants does not suggest that Emory Healthcare exercised enough control over the terms and conditions of Mines's employment to be considered his joint employer. [*Id.* ¶¶ 28–30]. Finally, Mines's allegations that Mautner and Boden, as representatives of Emory Healthcare, "exercised direct control" over Mines's duties and performance [*id.* ¶¶ 154, 190, 211], are conclusory, and the Court need not accept those allegations.

In short, Mines had to plead facts plausibly suggesting that Emory Healthcare was his employer. He failed to do so, and he cannot pursue Title VII and Section 1981 claims against Emory Healthcare. Those claims—Title VII race discrimination (Count One), Section 1981 race discrimination (Count Two), Title VII racially

hostile work environment (Count Three), Title VII retaliation (Count Four), and Section 1981 retaliation (Count Five)—should be dismissed as to Emory Healthcare.

## 2.      Discrimination Claims

Mines asserts race discrimination claims against the Emory Defendants under Title VII in Count One. And he raises parallel claims under Section 1981 against those same defendants and the two individual defendants in Count Two. Because courts apply the same standards and analytical framework when addressing claims of discrimination under Title VII and Section 1981, I will discuss the claims together. *Bryant*, 575 F.3d at 1296 n.20.

### a.      Failure-to-Promote

Mines claims that he was denied a series of promotions from 2011 through 2019. [SAC ¶¶ 152–67, 168–87]. For the reasons below, those claims are time-barred.

*Title VII*

Title VII requires a plaintiff to exhaust available remedies by filing a charge of discrimination with the EEOC before filing a lawsuit in federal court. 42 U.S.C. § 2000e–5; *Thomas v. Bed Bath & Beyond, Inc.*, 508 F. Supp. 2d 1264, 1275 (N.D. Ga. 2007). In a non-deferral state such as Georgia, the plaintiff must file the EEOC charge within 180 days of the date of the alleged discrimination. 42 U.S.C. § 2000e–

5(e)(1). Failure to file the charge within 180 days of the alleged unlawful employment practice bars the claim. *Alexander v. Fulton Cnty., Ga.*, 207 F.3d 1303, 1346 (11th Cir. 2000), *overruled in part on other grounds by Manders v. Lee*, 338 F.3d 1304, 1328 n.52 (11th Cir. 2003) (en banc).

Here, Mines filed his EEOC charge on June 11, 2023. [Doc. 1-2 at 2]. Ordinarily, only incidents that occurred within 180 days before Mines filed his charge, or on or after December 13, 2022, would be timely. *See Thomas v. Atlanta Public Schools*, No. 1:20-cv-4581-MHC-CMS, 2021 WL 2640503, at *6 (N.D. Ga. Apr. 30, 2021) (noting that claims relating to events that occurred more than 180 days before the date that the plaintiff filed her EEOC charge were barred), *adopted by* 2021 WL 2640809 (N.D. Ga. May 17, 2021). Mines's failure-to-promote claim relates to events that occurred between 2011 and 2019. [SAC ¶¶ 91–103]. The claim ordinarily would be time-barred and would be subject to dismissal. *Id.*

Mines, however, argues that the continuing violation doctrine applies here. [Doc. 62 at 4–7]. According to Mines, his race discrimination claims are "interconnected" and "are not separate, standalone claims, but rather essential facts that support [Mines's] hostile work environment, retaliation, and race discrimination claims." [*Id.* at 4]. Mines argues that the claims are "part of an ongoing and continuous pattern of unlawful conduct." [*Id.*]. According to Mines, the Second

84

Amended Complaint "alleges a continuous pattern of racial discrimination and retaliation by the Emory Defendants." [*Id.* at 5].

"The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim where at least one other violation occurred within the statutory period." *Brooks v. CSX Transp.*, 555 F. App'x 878, 880 (11th Cir. 2014) (per curiam). "However, the doctrine does not apply to discrete acts of discrimination, such as a promotion denial or refusal to hire." *Id.*

The continuing violation doctrine "exists to protect those plaintiffs who are unaware that discrimination is occurring until it results in a pattern of violations over time." *Phillips v. City of Atlanta*, No. 1:14-cv-680-TWT-RGV, 2016 WL 5429666, at *12 (N.D. Ga. July 29, 2016), *adopted by* 2016 WL 5394089 (N.D. Ga. Sept. 27, 2016). The continuing violation doctrine "distinguishes between '[a] knowing plaintiff [who] has an obligation to file promptly or lose [his] claim and 'a plaintiff who is unable to appreciate that []he is being discriminated against until []he has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern.'" *Id.* (some alterations in original) (quoting *Labady v. Gemini Air Cargo, Inc.*, 350 F. Supp. 2d 1002, 1011 (S.D. Fla. 2004)).

The continuing violation doctrine does not apply to Mines's failure-to-promote claim because promotion denials are discrete events. *Brooks*, 555 F. App'x

85

at 880.  Even if the continuing violation doctrine could cover the promotion denials, Mines has not pled facts suggesting that the continuing violation doctrine would apply here.  There is no reason to believe that Mines was unaware of the acts about which he now complains.  Rather, he seeks to avoid the limitations period by reciting the phrase "continuing violation," which is improper.  *Wolf v. MWH Contractors, Inc.*, 34 F. Supp. 3d 1213, 1222 (M.D. Fla. 2014).  Mines has alleged no facts to show that a pattern of discrimination that he was unaware of existed.  *See Schober v. Town of Fort Myers Beach, Fla.*, No. 2:13-cv-857-FtM-38CM, 2014 WL 6469881, at *5 (M.D. Fla. Nov. 17, 2014) (noting that a plaintiff "cannot dodge" the limitations period on a motion to dismiss "by merely stating the continuing violation doctrine" applied; she must claim that the defendant "engaged in a pattern of retaliation or had an employment practice that perpetuated the alleged wrong").  Instead, Mines simply alleges, in conclusory fashion, that the Emory Defendants engaged in a "pattern" or "practice" of discriminatory conduct.  [SAC ¶¶ 7, 87–88, 92, 240, 244].  The Court need not accept those conclusory allegations.

For the above reasons, Mines cannot use the continuing violation doctrine to save his untimely Title VII failure-to-promote claim.  The claim is thus time-barred and should be dismissed.

*Section 1981*

"Section 1981 does not contain an express statute of limitations." *Edwards v. Nat'l Vision, Inc.*, 568 F. App'x 854, 860 (11th Cir. 2014) (per curiam). In 1990, Congress enacted a catch-all provision, 28 U.S.C. Section 1658, that establishes a four-year statute of limitations for "a civil action arising under an Act of Congress enacted after the date of the enactment of this section," or after December 1, 1990. 28 U.S.C. § 1658(a). Section 1981 was originally enacted in 1866, but Congress substantively revised it in 1991. *James v. Nalley BMW of Decatur*, No. 1:18-cv-3216-TWT-LTW, 2020 WL 13664375, at *5 (N.D. Ga. Feb. 19, 2020), *adopted sub nom. by James v. Asbury Automotive Atlanta, LLC*, 2020 WL 13664284 (N.D. Ga. Mar. 12, 2020). "[T]o determine whether § 1658 applies to a claim under § 1981, the Court must decide if the claim was made possible by the 1991 amendment." *Id.* (internal quotation marks and citation omitted). "If § 1658 does not apply, the Court uses Georgia's two-year statute of limitations for personal injury claims, which applied to § 1981 claims prior to the enactment of § 1658." *Id.* Because Mines's Section 1981 failure-to-promote claim is based on a cause of action that existed before December 1, 1990, a two-year statute of limitations applies to the claim. *Dunston v. Gray Television*, No. 1:21-cv-5032-MLB-JEM, 2024 WL 4224176, at *14 (N.D. Ga. Apr. 30, 2024); *James*, 2020 WL 13664375, at *4–5.

87

Mines alleges that the promotion denials at issue occurred from 2011 to 2019. [SAC ¶¶ 91–103].  Thus, the two-year statute of limitations expired, at the latest, in 2021.  *Dunston*, 2024 WL 4224176, at *14; *James*, 2020 WL 13664375, at *4–5. Mines, however, did not file his Complaint until June 1, 2024.  [Doc. 1].  Mines's Section 1981 failure-to-promote claim ordinarily would be time-barred.

Mines argues that his Section 1981 failure-to-promote claim is not time-barred because "hostile work environments are 'unlawful employment practices,'" and courts may "consider the entire period of discriminatory conduct if one act occurs within the statutory timeframe." [Doc. 62 at 8].  This argument fails for two reasons.  First, the continuing violation doctrine does not apply to Section 1981 failure-to-promote claims because, as discussed above, "an employer's failure to promote is a discrete act or single occurrence." *Price v. M & H Valve Co.*, 177 F. App'x 1, 10 (11th Cir. 2006) (per curiam).  Second, as discussed below, Mines has not plausibly alleged that a hostile work environment existed.  Mines's Section 1981 failure-to-promote claim is thus time-barred and should be dismissed.

> **b.    Claims Based on Disparate Compensation, Alleged Demotion, and Loss of Position with the Falcons**

Mines also asserts Title VII and Section 1981 disparate treatment claims based on allegedly disparate compensation and an alleged demotion.  [SAC ¶¶ 51, 166,

177].   As noted above, "[w]here § 1981 is used as a remedy for employment discrimination, the elements required to establish a claim under § 1981 mirror those required for a Title VII claim." *Quach*, 2015 WL 13719674, at *8.  Although a plaintiff "need not establish a prima facie case [of discrimination] to survive [a] motion to dismiss, it is useful for guidance purposes to note the prima facie formulations that the courts have developed." *Woods*, 2020 WL 11884822, at *5 (internal citation omitted).  To establish a prima facie case of discrimination under Section 1981 or Title VII, a plaintiff must show that "1) []he is a member of a protected class; 2) []he was qualified for the position; 3) []he suffered an adverse employment action; and 4) []he was replaced by someone outside [his] protected class or was treated less favorably than a similarly-situated individual outside [his] protected class." *Phillips*, 2016 WL 5429668, at *8 (internal quotation marks omitted).

### *Compensation*

Here, Mines fails to state disparate treatment claims based on his compensation.  Mines has not set forth facts suggesting that any similarly situated physician outside his protected class was paid more than he was. *See Walton v. Ga. Dep't of Cmty. Affairs*, No. 1:21-cv-4164-MHC-CMS, 2022 WL 3337406, at *3 (N.D. Ga. July 6, 2022) ("The Eleventh Circuit has upheld dismissal of Title VII

discrimination claims where the complaint does not provide a factual basis for showing that the alleged comparator is similarly situated in all material respects.") (internal quotation marks and citations omitted); *Younge v. Fulton Jud. Circuit Dist. Attorney's Off., Ga.*, No. 1:20-cv-684-WMR-CMS, 2020 WL 12029309, at *4 (N.D. Ga. Dec. 21, 2020) (finding that a plaintiff failed to plead plausible disparate treatment claims under Section 1981 and Title VII where she simply alleged that "others outside of [her] protected class were treated differently" and that her supervisor "treated women in the office differently than he treated men") (alteration in original) (internal quotation marks omitted), *adopted by* 2021 WL 4901896 (N.D. Ga. Mar. 10, 2021).

Nor has Mines pled other facts to support a discriminatory compensation claim.  Mines alleges that:

(1)     He faced a "discriminatory atmosphere."  [SAC ¶ 4].

(2)     "Stemming from the systemic and ingrained racial bias at Emory, the bar for [Mines], as a Black physician, to obtain was markedly higher than his white counterparts."  [*Id.* ¶ 75].

(3)     Mines "repeatedly observed how similarly situated white physicians were afforded privileges that he was not," and he "encountered numerous instances where white physicians were not being held accountable when issues arose that objectively required addressing."  [*Id.* ¶ 76].

(4)     The Emory Defendants "intentionally and maliciously subjected [Mines] to disparate treatment" because of his race.  [*Id.* ¶ 156].

90

(5)    The Emory Defendants "fostered, condoned, accepted, ratified, or otherwise failed to prevent or remedy discriminatory conduct due to race or color," and they "participated in and aided and abetted the discriminatory conduct of one another." [*Id.* ¶ 157].

(6)    Boden and Mautner engaged in "intentional discrimination" or "discriminatory conduct" toward Mines. [*Id.* ¶ 160–61].

(7)    The Emory Defendants "engaged in unlawful employment practices and discriminated against [Mines] based on his race." [*Id.* ¶ 162].

(8)    The Emory Defendants' conduct adversely affected Mines's "status as an employee because of his race," and this "discriminatory conduct" caused "long-term professional harm." [*Id.* ¶ 163].

(9)    Boden and Mautner engaged in "racially discriminatory behavior" that "was intentionally directed at [Mines] and was based on [Mines's] race." [*Id.* ¶¶ 164, 184].

(10)    The Emory Defendants "discriminated against [Mines] on the basis of race and/or color" [*id.* ¶ 165], and they "took adverse employment actions against" him [*id.* ¶ 166].

(11)    The Emory Defendants based their "discriminatory conduct" on Mines's race [*id.* ¶ 167], and they "intentionally discriminated against [Mines] on the basis of his race" [*id.* ¶ 172].

(12)    The Emory Defendants "intentionally discriminated against [Mines] when subjecting him to unequal compensation relative to his white peers." [*Id.* ¶ 177].

(13)    The conduct deprived Mines "of equal employment opportunities and has otherwise adversely affected his status as an employee because of his race." [*Id.* ¶ 180].

All of these allegations, however, are conclusory and must be disregarded. And, as

discussed above, the Court need not accept as true allegations that are unsupported

by facts and are based only on "information and belief." *Howard*, 2022 WL

2389277, at \*7; *see also Midway Ins. Mgmt. Int'l, Inc.*, 2021 WL 4815890, at \*12. Mines has pled no facts to support his discriminatory compensation claims. Nor has he alleged facts plausibly suggesting that any compensation disparities were based on intentional race discrimination claims, as required for a Section 1981 disparate treatment claim.

Mines also fails to set forth facts suggesting that the Emory Defendants maintained racially discriminatory compensation practices or policies. He simply relies on conclusory allegations. *See* [SAC ¶¶ 87 (alleging that "Emory" and "Boden" engaged in "historically demeaning, dismissive, and disparate treatment" that "indicated a clear pattern and practice of racial discrimination, mainly and specifically against Black people"), 88 (stating that Boden engaged in "consistent efforts to undermine, belittle, and discredit [Mines's] work in front of his colleagues and third parties," which was "a systemic pattern of racial discrimination and retaliation being perpetrated by one of Emory's most senior C-Level executives"), 92 (alleging that Mines was "conspicuously overlooked for leadership roles," and "[t]his pattern is not only indicative of bias but is also direct evidence of race discrimination"), 244 (alleging that the Emory Defendants "engaged in a calculated, extended, and extensive pattern of race discrimination"). Mines, therefore, fails to allege plausible disparate treatment claims based on his compensation.

92

*Demotion*

Mines appears to base his "demotion" claim on the decision to add Hill to the 2023 Agreement.  As discussed above, Mines fails to plausibly allege facts suggesting that Hill's addition to the 2023 Agreement was a demotion.  Boden made clear to Mines that Mines's title had not changed.  [Doc. 1-8 at 1].  Mines has not alleged facts showing that he suffered a loss in compensation or a reduction in any other privileges as a result of Hill's addition to the 2023 Agreement.

Nor has Mines alleged facts showing that Emory was responsible for the decision to add Hill to the 2023 Agreement.  Rather, the correspondence between Mines and Boden reveals that the Falcons decided to add Hill to the 2023 Agreement. [Doc. 1-8 at 1].  In any event, Mines has pled no facts plausibly suggesting that the decision to add Hill was based on race.  Mines, therefore, cannot state a plausible disparate treatment claim for an alleged "demotion" relating to Hill's addition to the 2023 Agreement.

*Loss of the Head Team Medical Position with the Falcons*

Mines's discrimination claims against the remaining Defendants based on his loss of the Head Team Medical Position fails for the same reasons as his similar claim against the Falcons fails.  Mines presents only conclusory allegations to

support the claim, and he alleges no facts plausibly suggesting that his race was the but-for reason for his removal from the Head Team Medical Position.

*Summary*

In short, Mines has not pled plausible Title VII or Section 1981 disparate treatment claims based on compensation, an alleged demotion, or his loss of his position as the Head Team Medical Physician with the Falcons. These claims should be dismissed.

### c.    Constructive Discharge

Mines also asserts a race claim for unlawful constructive discharge under Title VII and Section 1981. [SAC ¶¶ 4, 166, 176, 197–98, 214, 223].

*Failure to Exhaust Administrative Remedies Under Title VII*

Mines was required to exhaust his administrative remedies for his Title VII constructive discharge claim by filing a charge of discrimination with the EEOC within 180 days after his constructive discharge. 42 U.S.C. § 2000e–5; *Thomas*, 508 F. Supp. 2d at 1275. Mines filed an EEOC Charge on June 12, 2023, and he filed an amended Charge on March 11, 2024. [Doc. 1-2; Doc. 1-3]. Mines tendered his notice of resignation on April 26, 2024, stating that he was resigning effective May 3, 2024. [SAC ¶ 121]. Mines, however, did not amend his EEOC Charge to add a constructive discharge claim. Mines thus failed to exhaust his administrative

94

remedies for his Title VII constructive discharge claim, and the claim is barred. *Alexander*, 207 F.3d at 1346 (11th Cir. 2000); *see also Green v. SVC Mfg., Inc.*, No. 1:16-cv-4156-TWT-RGV, 2017 WL 3382566, at *5 (N.D. Ga. July 14, 2017) (concluding that a plaintiff failed to exhaust her administrative remedies for a constructive discharge claim where the plaintiff filed an EEOC Charge before she resigned and failed to amend the Charge or file a new Charge to include the constructive discharge claim; the constructive discharge claim would not reasonably have been expected to arise during the EEOC's investigation related to the plaintiff's earlier-filed Charge), *adopted by* 2017 WL 3335756 (N.D. Ga. Aug. 4, 2017).

*Mines Has Not Pled a Constructive Discharge Claim*

Alternatively, Mines has not pled a plausible constructive discharge claim. To support his constructive discharge claims, Mines alleges that:

    (1)    He "encountered repeated instances of discrimination and marginalization," was "consistently overlooked for leadership opportunities in favor of white physicians," and was "branded . . . with offensive, stereotypical labels such as 'angry' and 'aggressive,' further perpetuating a hostile work environment." [SAC ¶ 3].

    (2)    Boden and Mautner fostered a "discriminatory atmosphere," and Mines's "opposition to race discrimination at Emory was met with retaliatory actions, further exacerbating the toxic work environment he was forced to endure, until Emory terminated [him] via constructive discharge." [*Id.* ¶ 4].

(3)    "Stemming from the systemic and ingrained racial bias at Emory," Mines had a "markedly higher" bar to attain "than his white counterparts." [*Id.* ¶ 75].

(4)    Mines "repeatedly observed how similarly situated white physicians were afforded privileges that he was not," and, on "numerous instances," "white physicians were not being held accountable when issues arose that objectively required addressing." [*Id.* ¶ 76]. Mines, on the other hand, "was summarily terminated" from the Head Team Medical Physician position with the Falcons, and he "was not afforded the same opportunity to cure or remediate those issues as his white counterparts." [*Id.* ¶ 77].

(5)    Throughout his employment with Emory, Mines "was subjected to hostile, negative, and unwarranted feedback from [Boden] and [Mautner], all of which included common racial stereotypes about Black men—that he was lazy, that he was not proactive, that he lacked motivation, that he was dishonest, [and] that he was fundamentally less qualified than his white colleagues to hold leadership positions within the organization." [*Id.* ¶ 79].

(6)    Mines expressed concerns to a white female contractor, Amy DeRosa, about team coverage decisions for CAU being made without communicating adequately with Mines, who was serving as Clark Atlanta's medical director. [*Id.* ¶¶ 83–84, Doc. 1-10 at 4]. DeRosa allegedly responded "condescendingly and disrespectfully, inclusive of jabs and explicit accusations against [Mines's] honesty and trustworthiness." [*Id.* ¶ 84; *but see* Doc. 1-10 at 1–3]. According to Mines, Boden defended DeRosa and demanded that Mines apologize to her, without evidence or justification and while condoning DeRosa's attack on Mines's character and integrity, as well as DeRosa's attempts to undermine Mines's authority. [*Id.* ¶¶ 82, 85].[7]

---

[7] The exhibit relating to the DeRosa incident contradicts Mines's characterization of the events. [Doc. 1-10]. Notably, Boden did not demand that

(7)     After the DeRosa incident, "Emory took a further discriminatory and retaliatory step in [Mines's] 2021 fiscal year performance evaluation by referring to [Mines] as 'aggressive,' thereby invoking derogatory racial stereotypes and revealing racial animus toward [Mines] as a Black man." [*Id.* ¶ 86].

(8)     Emory's Sports Medicine Department had a "toxic and discriminatory environment." [*Id.* ¶ 80].

(9)     "Emory's and Boden's historically demeaning, dismissive, and disparate treatment towards [Mines] was not just inappropriate and unprofessional; it also indicated a clear pattern and practice of racial discrimination, mainly and specifically against Black people." [*Id.*¶ 87].

(10)    Boden made "consistent efforts to undermine, belittle, and discredit [Mines's] work in front of his colleagues and third parties," resulting in "a systemic pattern of racial discrimination and retaliation being perpetrated by one of Emory's most senior C-Level executives." [*Id.* ¶ 88].

(11)    On January 23, 2023, Chelsea Richardson, a clinic manager, told Mines that he was not permitted to have visitors in the office. [*Id.* ¶ 89]. Mines questioned this policy and complained to his supervisor after "it became clear that this policy was only being applied to [Mines] as a Black physician," but "Emory failed to investigate or resolve [Mines's] complaint." [*Id.* ¶ 90].[8]

---

Mines apologize; he recommended that Mines apologize and left the decision up to Mines. [*Id.* at 1]. No portion of the exchange involved complaints about race discrimination or retaliation. *See generally* [Doc. 1-10].

[8] The exhibit relating to the visitor policy reflects that Mines did not complain about race discrimination or retaliation relating to the visitor policy. *See generally* [Doc. 1-11]. Rather, Mines questioned the policy because he had not previously heard about it. [*Id.* at 1–2].

(12)  Mines was passed over for leadership positions and opportunities for advancement, and he was subject to "a systematic denial of opportunities that are otherwise readily available to his white peers." [*Id.* ¶ 91].

(13)  Mines was "conspicuously overlooked for leadership roles." [*Id.* ¶ 92]. Mines was not selected for (1) a Head Team Physician position with the Falcons in 2011 [*id.* ¶¶ 95–96], (2) a 2017 Head Team Physician with the Braves [*id.* ¶¶ 101–02], and (3) a Head Team Physician position with the Falcons in 2019 (even though Dr. Karas recommended Mines) [*id.* ¶¶ 97–100]. According to Mines, Boden "appointed only white physicians" for leadership positions, and he "intentionally and maliciously rejected recommendations from other Emory leaders" about Mines's candidacy for the positions. [*Id.* ¶ 103]. According to Mines, "Boden and Mautner excluded [Mines] from leadership and professional growth opportunities while providing leadership opportunities to less experienced white male physicians, despite [Mines] possessing qualifications and expertise that surpass those of his white colleagues," resulting in Mines "being unjustly deprived of professional advancements, opportunities for growth, and inclusivity." [*Id.* ¶ 194].

(14)  Mines also alleges that he was not considered for the Director of Primary Care Sports Medicine position in 2011, and Boden and Mautner refused to create a position for Mines as Co-Director of the Sports Medicine Department after Mines suggested that they do so. [*Id.* ¶¶ 104–111]. According to Mines, on October 5, 2023, he complained in his annual review to Mautner and Richardson that "he kept getting the runaround from Boden and Mautner regarding the Co-Director of Sports Medicine position." [*Id.* ¶ 108]. Mines states, "[u]pon information and belief, Boden and Mautner intentionally retaliated against [Mines] by [instead] creating a lower-level position that neither acknowledged nor provided him with an appropriate role commensurate with his experience." [*Id.* ¶ 110].

(15)  Mines "faced racial microaggressions as well as overt race discrimination and retaliation." [*Id.* ¶ 112].

(16)  On June 12, 2023, Mines filed an EEOC Charge alleging race discrimination regarding his termination from the Falcons, and he did so "due to [his] growing disillusionment with Emory's discriminatory culture." [*Id.* ¶ 113].

(17)   When Mines complained to Mautner in October 2023 that Mines's termination from the Falcons was "racially motivated," Mautner told Mines that was not the case and pointed out that Mautner "had a Black son and, therefore, fully understood everything [Mines] experienced as a Black man." [*Id.* ¶ 114]. According to Mines, Mautner's comment was "tone-deaf and highly offensive," and it "also evidenced racial bias and insensitivity." [*Id.* ¶ 115].

(18)  On November 25, 2023, Mines filed a complaint with Emory's DEI department, and the DEI department eventually told Mines that it would not investigate the claim because it overlapped with Mines's pending EEOC Charge. [*Id.* ¶ 116].

(19)  On February 8, 2024, Mines complained to Boden and Mautner that Ms. Richardson was insubordinate and disrespectful. [*Id.* ¶ 117]. Mines was told that the claim would not be investigated because Richardson was employed by Emory Healthcare. [*Id.* ¶ 118]. Mines was not provided information about how to complain to Emory Healthcare. [*Id.*]. According to Mines, "Emory's mishandling of [his] complaint against [Richardson] was symptomatic of a more significant issue at Emory – a reminder of the 'place' designated for a Black man, circumscribed by unwritten rules rooted in a history of exclusion and discrimination." [*Id.* ¶ 119]. Mines alleges that his "complaint was ignored, and he was chastised for referring to [Richardson] as an 'office manager' and informed by Mike

Hattery that he should consider [Richardson], a white woman and non-physician office administrator—as an 'equal.'" [*Id.* ¶ 119].[9]

(20)   "Despite [Mines's] repeated efforts to seek support from Emory's DEI department, Emory repeatedly refused to investigate, demonstrating their direct knowledge of and complicity in maintaining a racially discriminatory and retaliatory environment." [*Id.* ¶ 120].

(21)   On April 26, 2024, Mines resigned from Emory effective May 3, 2024, "after enduring 12 months of severe and pervasive discrimination and retaliation." [*Id.* ¶ 121]. According to Mines, he "had reached his breaking point and felt he had no choice," and his "work environment at Emory had become so intolerable that he felt compelled to resign to avoid further discrimination, retaliation, defamation, and emotional harm." [*Id.* ¶ 122].

(22)   Mines "complained and repeatedly voiced his feelings of extreme concern and unsafety to Emory's internal investigation team, pointing out that the racially discriminatory comments from his colleagues and supervisors had created a toxic working environment." [*Id.* ¶ 123]. Although Mines "complained half a dozen times about his personal experience of racial discrimination" over twelve months, "not a single complaint was thoroughly investigated, nor did Emory make any tangible effort to remediate the professional and emotional harm [he] was suffering." [*Id.* ¶ 124].

(23)   "The ongoing and incessant nature of these discriminatory and retaliatory experiences, combined with an overall sense of unsafety within the Emory culture, resulted in a racially hostile work environment where [Mines's] identity as a Black man was continually undermined and ignored." [*Id.* ¶ 125]. "Emory made it abundantly clear by failing to properly investigate, evaluate, or

---

[9] The exhibit relating to Mines's complaint about Richardson does not reflect that Mines complained about racially discriminatory or retaliatory conduct. *See generally* [Doc. 1-12].

remediate [Mines's] multiple claims of discrimination and retaliation that Emory could not (or would not) ensure a safe environment devoid of discriminatory treatment and retaliatory conduct." [*Id.* ¶ 126; *see also id.* ¶ 200 (stating that the Emory Defendants "ignored and failed to investigate [Mines's] numerous complaints of race discrimination, thereby maintaining an environment that was hostile towards [Mines] and other Black employees.")].

(24)  The Emory Defendants, along with the Falcons, "took intentional steps to isolate, retaliate, and marginalize [Mines] that were professionally damaging and personally demoralizing." [*Id.* ¶ 145].

(25)  Mines endured "pervasive discriminatory and retaliatory treatment from his colleagues and supervisors at Emory." [*Id.* ¶ 146]. He suffered a "psychological toll" from the "stresses of working within a discriminatory, retaliatory, and hostile environment," and "the stress of race discrimination and retaliation [he] experienced" caused "negative impacts" on his "home life and marital relationship." [*Id.* ¶ 147; *see also id.* ¶ 202 (alleging that "as a result of" the Emory Defendants' "race discrimination, negligence, and retaliation," Mines suffered "long-term harm")].

(26)  Boden and Mautner engaged in "race discrimination" and created "a racially hostile work environment" for Mines. [*Id.* ¶ 190; *see also id.* ¶ 204 (alleging that "[o]n multiple occasions and throughout [Mines's] employment," Boden and Mautner "engaged in repeated discriminatory conduct, such that [Mines's] work environment became intimidating, hostile, and abusive.")]. According to Mines, the Emory Defendants "condoned[] and ratified a severe, prolonged, and outrageous hostile work environment for [Mines]." [*Id.* ¶ 192; *see also id.* ¶ 195 (stating that the Emory Defendants "retaliated against [Mines] by creating, condoning, and ratifying a severe, prolonged, and outrageous hostile work environment for reporting race discrimination")]. Mines alleges that the Emory

101

Defendants "created this environment not only for [Mines] but for other Black employees at Emory as well." [*Id.* ¶ 195]. According to the SAC, this conduct was "severe and pervasive" and "would dissuade a reasonable employee from" reporting discrimination or supporting a complaint of discrimination. [*Id.* ¶ 196].

(27)   Boden "persistently used coded, racially motivated language to describe [Mines], most commonly describing [Mines] as 'angry' and 'aggressive.'" [*Id.* ¶ 193].

(28)   Mines's "resignation was a constructive discharge because it was the direct and proximate consequence of severe and pervasive racial discrimination and retaliation that made his working environment so intolerable that a reasonable person would have felt compelled to resign." [*Id.* ¶ 198].

(29)   "The repeated and continuous nature of [Boden's and Mautner's] discriminatory conduct was the direct and proximate cause of [Mines's] work environment. Because the Emory Defendants refused to investigate or remediate the ongoing discrimination, [Mines] was constructively discharged from Emory on May 3, 2024." [*Id.* ¶ 205]. Mines resigned due to the conduct of Boden and Mautner, "which constituted a constructive discharge." [*Id.* ¶ 206].

(30)   "[Mines's] race was a motivating factor in [Boden's and Mautner's] treatment of [Mines] and their decision to terminate his employment constructively." [*Id.* ¶ 207].

These allegations, even viewed in the light most favorable to Mines, do not plead enough facts to allege a viable race-based or retaliatory constructive discharge claim. Most of the allegations are conclusory and must be disregarded. The non-conclusory allegations fail to meet the high bar for pleading a constructive discharge claim in this Circuit.

102

"'A constructive discharge occurs when a discriminatory employer imposes working conditions that are so intolerable that a reasonable person in the employee's position would have been compelled to resign.'" *Marshall v. Tidal Wave Resp., LLC*, 649 F. Supp. 3d 1299, 1308 (N.D. Ga. 2022) (quoting *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir. 2003)). The "reasonable person standard is an objective standard, so courts do not consider a plaintiff's subjective feelings." *Johnson v. Neopost, Inc.*, No. 1:06-cv-1202-JOF-AJB, 2007 WL 9701787, at *24 (N.D. Ga. Nov. 8, 2007), *adopted by* 2008 WL 11406067 (N.D. Ga. Mar. 4, 2008). Pleading a constructive discharge claim is difficult; indeed, the Eleventh Circuit has noted that "[e]stablishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim." *Bryant*, 575 F.3d at 1298.

Mines cannot establish a constructive discharge claim based solely on the alleged failures to promote him, even if the denials of the promotions were discriminatory. *See Sprowl v. Mercedes-Benz U.S. Int'l*, 815 F. App'x 473, 481 (11th Cir. 2020) (per curiam) ("Absent a showing of additional, difficult working conditions, failure to promote does not give rise to an intolerable working condition."); *Johnson*, 2007 WL 9701787, at *25 ("[A] failure to promote an employee is not generally found to be sufficient to establish a constructive discharge even if the denial of the promotion was discriminatory."). Mines has not pled, for

103

example, facts to show that his working conditions were so intolerable that a reasonable person in his position would have been compelled to resign.  Mines (1) alleges that he was a top performer who was denied a series of promotions [SAC ¶¶ 92–111], (2) complains about allegedly being required to apologize to a contractor [*id.* ¶¶ 83–85], the visitor policy [*id.* ¶¶ 89–90], and Richardson's alleged "insubordination and disrespect" [*id.* ¶¶ 117–120], and (3) alleges that Emory did not investigate his complaints properly [*id.* ¶¶ 90, 116–20, 123, 125–26, 200].  Mines pleads no facts about his working conditions—such as his hours, salary, assignments, or being subjected to racially-charged conduct or derogatory remarks based on his race—and he instead relies only on conclusory allegations.  He has pled no factual allegations to support his contention that he was subjected to a race-based or retaliatory hostile work environment (or any harassment, harsh treatment, or additional, difficult working conditions).

Moreover, Mines cannot establish a constructive discharge claim based on Emory's alleged failure to resolve his internal complaints properly.  *See Johnson*, 2007 WL 9701787, at *25 (stating that "a company's failure to resolve an employee's complaints does not necessarily constitute a constructive discharge").  Although Mines may have been displeased with the DEI department's responses to his internal complaints and with the responses to his complaints about the visitor

policy and Richardson, that "is irrelevant for the objective constructive discharge analysis." *Id.* at *26.

The Second Amended Complaint's factual allegations, even taken together and viewed in the light most favorable to Mines, fall far short of satisfying the constructive discharge standard in this Circuit. Indeed, "[c]ases where courts have determined a constructive discharge existed have involved much more severe incidents than those present in the instant case." *Johnson*, 2007 WL 9701787, at *25 (collecting cases).

For the above reasons, Mines has not pled a plausible constructive discharge claim under either Title VII or Section 1981. Those claims should be dismissed.

### 3.      Hostile Work Environment Claim (Count Three)

In Count Three, Mines asserts a claim for a hostile work environment under Title VII. [SAC ¶¶ 188–208].[10]  To state a viable claim for a hostile work environment, a plaintiff must plead and ultimately prove that: "(1) he belongs to a

---

[10] The Second Amended Complaint asserts a hostile work environment claim only under Title VII, not Section 1981. [SAC ¶¶ 188–208]. Even if Mines had asserted a hostile work environment claim under Section 1981, it would fail for the same reasons that his Title VII hostile work environment claim fails. *See Shields v. Fort James Corp.*, 305 F.3d 1280, 1282 (11th Cir. 2002) (noting that the same requirements and analytical framework apply to both Section 1981 and Title VII hostile work environment claims).

protected group; (2) he suffered unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as [race]; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for that environment under a theory of either direct liability or vicarious liability." *Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020). "[T]o establish that a workplace constitutes a hostile work environment, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008) (internal quotation marks and citation omitted).

Determining whether harassment was severe or pervasive enough to state a hostile work environment claim involves "both an objective and a subjective component." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002). "In determining the objective element, a court looks to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *McCann v.*

106

*Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (internal quotation marks and citation omitted).  When determining whether harassment is objectively severe, courts must "examine the conduct in its context, not as isolated acts."  *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1335 (11th Cir. 2023) (internal quotation marks and citation omitted).  "And this context includes comments and conduct beyond the timeframe otherwise actionable."  *Id.*

The Eleventh Circuit has recognized that "[i]t is a 'bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII.'"  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (quoting *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc)).  "Therefore, only conduct that is based on a protected category, such as race, may be considered in a hostile work environment analysis."  *Id.* (internal quotation marks and citations omitted).  "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted."  *Id.* (alteration in original) (internal quotation marks and citation omitted).  Courts must "be cognizant of the surrounding circumstances" when determining whether conduct is based on a protected category.  *Id.* at 1298.

Here, Mines appears to base his hostile work environment on the same allegations that underlie his constructive discharge claim.  As discussed above, most

of the allegations are conclusory and must be disregarded. Mines pleads no facts to show that he was subjected to race-based, derogatory language or conduct, and he has not alleged when any such incidents occurred. He alleges that Boden and Mautner referred to him as "angry" or "aggressive" on unspecified occasions, but he fails to plead facts showing that this language was race-based. [SAC ¶¶ 3, 86, 193]. And, although Mines alleges that he faced "microaggressions" at unspecified times throughout his employment with Emory, he pleads no facts to show what those "microaggressions" were or to show that they were race-based. [*Id.* ¶ 112]. That Mines subjectively concluded that the "angry" or "aggressive" comments and "microaggressions" were based on race is not enough. Without alleging *facts* that would allow a court to conclude that the comments or "microaggressions" were based on race, Mines cannot establish a racially hostile work environment claim based on the comments or "microaggressions." *See Palmer v. Potter*, No. 1:08-cv-3876-CAM-AJB, 2010 WL 11500520, at \*22 (N.D. Ga. Jan. 12, 2010) (noting that for conduct to support a hostile work environment claim, the conduct must be based on the employee's protected characteristic), *adopted by* 2010 WL 11508700 (N.D. Ga. Mar. 25, 2010).

Further, even if those comments or "microaggressions" could be presumed to be race-related conduct, Mines has pled no facts to show when or how often they

occurred.  Courts in this Circuit have held that a plaintiff cannot state a hostile work environment claim based on a few incidents of offensive language or conduct.  *See McDowell v Ala. Dep't of Pub. Health*, No. 2:20-cv-280-JTA, 2022 WL 988377, at *6 (M.D. Ala. Mar. 31, 2022) (finding that a plaintiff failed to state a claim for a hostile work environment where the employee alleged that his supervisor called him "half a person"); *Kohles v. Amerifleet Transp., Inc.*, No. 1:19-cv-122-ELR-CMS, 2019 WL 13268207, at *3 (N.D. Ga. May 9, 2019) (observing that allegations about the plaintiff's age and the age of her fellow employees and the employer's termination of older individuals "cannot, as a matter of law, plausibly constitute the type of repeated and extreme behavior that the Eleventh Circuit requires to state a hostile work environment claim") (collecting cases), *adopted by* 2019 WL 13268206 (N.D. Ga. June 13, 2019) (Ross, J.); *see also McCann*, 526 F.3d at 1379 (concluding that "instances of racially derogatory language alone, extending over a period of more than two years, are too sporadic and isolated to establish that [the plaintiff's] employers' conduct was so objectively severe or pervasive as to alter the terms and conditions of her employment").  Absent factual details showing when or how often any allegedly race-based comments or incidents occurred, Mines fails to plead that the comments or incidents were sufficiently objectively severe or pervasive to alter the terms of his employment and create a hostile work environment.

Nor can Mines base his hostile work environment claim on being passed over for promotions or on being "demoted" or removed from the Head Team Medical Physician position with the Falcons. Those allegations relate to retaliation or to discrete acts of discrimination, not to a hostile work environment. *McCann*, 526 F.3d at 1379. Mines, therefore, cannot establish a racially hostile work environment based on those allegations.

In short, Mines fails to allege facts to support an inference that the allegedly racially hostile conduct was severe or pervasive enough to alter the terms and conditions of his employment and create a hostile work environment. Mines, therefore, has not pled a plausible hostile work environment claim under Title VII. *See Woods*, 2019 WL 13078822, at *8–9 (N.D. Ga. June 27, 2019) (recommending dismissal of a hostile work environment claim when the plaintiff failed to allege facts to show that "there was harassment severe or pervasive enough to alter the terms and conditions of employment and create a hostile or abusive working environment") (internal quotation marks and citation omitted). The motion to dismiss should be granted as to Count Three.

### 4.    Retaliation Claims (Counts Four and Five)

Mines also asserts retaliation claims under Title VII and Section 1981. [SAC ¶¶ 209–24]. The same legal standard that applied to Mines's Section 1981 retaliation

claim against the Falcons also applies to these claims. *See Cox v. Fulton Cnty. Sch. Dist.*, No. 1:19-cv-4520-RGV, 2020 WL 3046092, at *5 (N.D. Ga. May 22, 2020) ("The same legal standard applies to retaliation claims under both Title VII and § 1981."), *adopted by* 2020 WL 3046096 (N.D. Ga. June 8, 2020). For the reasons below, Mines has not pled plausible retaliation claims.

*Head Team Medical Physician*

Mines's Title VII and Section 1981 retaliation claims against the remaining Defendants relating to his alleged removal from the Head Team Medical Physician position with the Falcons fail for the same reasons that his retaliation claims against the Falcons fail. Mines has not alleged facts plausibly suggesting that he engaged in protected conduct before he was removed from this position. Mines alleges that he was terminated as the Head Team Medical Physician because he raised concerns about compliance with the CBA, but that activity was not protected conduct because it did not relate to an unlawful employment practice. [SAC ¶¶ 49, 52, 58, 62, 65, 218,]. Mines also alleges that he was terminated as the Head Team Medical Physician after he complained about Hill's addition to the 2023 Agreement. [*Id.* ¶¶ 50, 52, 58, 62, 65, 218]. Mines, however, has not alleged facts plausibly suggesting that his complaints about Hill raised concerns about race discrimination,

111

and the corresponding exhibit reveals that Mines did not raise such concerns.  [Doc. 1-8].

Mines argues in his response that he engaged in protected conduct after his removal from the Head Team Medical Physician job.  [Doc. 62 at 16–17].  Conduct that occurs after an adverse employment action, however, cannot support a retaliation claim.  *See Zamora v. Gainesville City Sch. Dist.*, No. 2:14-cv-21-WCO-JCF, 2015 WL 12852321, at *4 (N.D. Ga. Aug. 26, 2015) ("[T]he protected conduct must occur *before* the adverse employment action.") (emphasis in original).

Even if Mines had complained about race discrimination before his removal from the Head Team Medical Position, his retaliation claim relating to that removal would still fail.  As discussed above, Mines has pled only conclusory assertions to support the claim, and he has not set forth enough facts to plausibly suggest that the removal was in retaliation for protected conduct.

*Internal Complaints and EEOC Charges*

Mines also alleges that he was retaliated against after he reported race discrimination to the DEI department and filed EEOC Charges by ignoring his complaints and by "creating a pervasively hostile work environment, which ultimately led to [his] constructive discharge."  [SAC ¶¶ 213–14, 222–23].  As discussed above, Mines has not plausibly pled that he was constructively discharged

112

or that he was subjected to a hostile work environment. Moreover, "[t]o establish a retaliatory hostile work environment, [Mines] needed to show that the mistreatment []he endured 'might have dissuaded a reasonable worker from making or supporting a charge' under the [statute]." *Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 149 (11th Cir. 2021) (per curiam) (quoting *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020)). Mines has not met that burden because he has not pled facts to support his claim that he was mistreated or retaliated against. Instead, Mines relies on conclusory allegations that the remaining Defendants engaged in retaliation. That is not enough to satisfy Mines's burden to plead his retaliation claims.

Moreover, Mines cannot state plausible retaliation claims based on the alleged failure to address or to investigate his internal complaints. *See Williams-Evans*, 843 F. App'x at 150 (noting that even if an employer ignored an employee's HR complaint, "that shows only a failure to act, not a material adverse action sufficient to make out a retaliation claim"); *Entrekin v. City of Panama City, Fla.* 376 F. App'x 987, 995 (11th Cir. 2010) (per curiam) (concluding that an employer's refusal to accept and investigate an employee's complaints against her coworkers "are not adverse employment actions, because these actions were not taken against [the employee] herself").

113

*Summary*

For the above reasons, Mines has not pled plausible Title VII or Section 1981 retaliation claims against the remaining Defendants.  Counts Four and Five should be dismissed.

### B.    State Law Claims

If the district judge agrees with my recommendation that all of Mines's federal law claims should be dismissed, the district judge could exercise discretion to decline supplemental jurisdiction over Mines's state law claims, including the defamation claim contained in Count Nine.  28 U.S.C. § 1367(c); *Parker*, 468 F.3d at 743.  Alternatively, for the reasons below, Mines's state law claims against the remaining Defendants for intentional infliction of emotional distress, negligent infliction of emotional distress, fraud, breach of contract, and negligent retention should be dismissed for failure to state a claim.

### 1.    Intentional Infliction of Emotional Distress (Count Six)

In Count Six, Mines asserts a claim for intentional infliction of emotional distress.  [SAC ¶¶ 228–38].  A plaintiff asserting an intentional infliction of emotional distress claim under Georgia law must allege, and ultimately prove: "(1) intentional or reckless conduct; (2) that is extreme and outrageous; (3) that is causally connected to the emotional distress; and (4) that results in severe emotional

114

distress." *Brown v. Fluellen*, 564 F. Supp. 3d 1308, 1316 (N.D. Ga. 2021). "For conduct to be sufficient to meet the necessary standard, it must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Garcia v. Shaw Indus., Inc.*, 741 S.E.2d 285, 289 (Ga. Ct. App. 2013)).

"In Georgia, disadvantageous employment actions standing alone cannot serve as the basis for the tort of intentional infliction of emotional distress." *Wilson v. Georgia-Pacific Corp.*, 4 F. Supp. 2d 1164, 1168 (N.D. Ga. 1998) (citing *Clark v. Coats & Clark*, 990 F.2d 1217, 1229 (11th Cir. 1993)). Further, "derogatory comments in the employment context generally do not meet the 'extreme and outrageous conduct' element" of a claim for intentional infliction of emotional distress. *MackMuhammad v. Cagle's, Inc.*, 379 F. App'x 801, 806 (11th Cir. 2010) (per curiam) (citing *Jarrard v. United Parcel Serv., Inc.*, 529 S.E.2d 144, 146–47 (Ga. Ct. App. 2000)).

Mines bases his intentional infliction of emotional distress claim on allegedly disadvantageous employment actions, including "discriminatory and tortious conduct" and "pervasive race discrimination and retaliation." [SAC ¶¶ 231–32]. In his response brief, Mines argues that the Second Amended Complaint "alleges a pattern of extreme conduct, including racial discrimination, undermining [Mines's]

115

professional reputation, and interfering with his employment." [Doc. 62 at 19]. Mines also claims that Boden and Mautner abused their authority. [*Id.* at 19–20]. As discussed above, however, Mines fails to allege facts to support any of those contentions. Instead, Mines relies on conclusory allegations, which must be disregarded. Even if Mines suffered some adverse employment actions, those actions, standing alone, would not be enough to support an intentional infliction of emotional distress claim. *Wilson*, 4 F. Supp. 2d at 1168.

In short, the allegations in the Second Amended Complaint fall far short of establishing an intentional infliction of emotional distress claim. Count Six, therefore, should be dismissed.

### 2. Negligent Infliction of Emotional Distress (Count Seven)

In Count Seven of the Second Amended Complaint, Mines asserts a negligent infliction of emotional distress claim against the Emory Defendants. [SAC ¶¶ 239–49]. This claim fails because "[t]here is no independent tort in Georgia for negligent infliction of emotional distress." *Holbrook v. Stansell*, 562 S.E.2d 731, 733 (Ga. Ct. App. 2002) (citing *Lee v. State Farm & Cas. Ins. Co.*, 533 S.E.2d 82 (Ga. 2000)). "Generally, '[i]n a claim concerning negligent conduct, a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury.'" *Id.* (alteration in original) (quoting *Ryckeley v.*

116

*Callaway*, 412 S.E.2d 826, 828 (Ga. 1992)).  Georgia's "impact rule has three elements: (1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical injury to the plaintiff causes the plaintiff's mental suffering or emotional distress."  *Lee*, 533 S.E.2d at 85.  Here, Mines alleges no facts suggesting that he can satisfy any of the impact rule's three elements.

In his response brief, Mines argues that "the Impact Rule does not apply to malicious, willful, or wanton conduct directed at [Mines]."  [Doc. 62 at 20].  Mines also argues that "the Impact Rule does not apply when there is pecuniary loss from a tort involving personal injury, even if non-physical."  [*Id.* at 21].  According to Mines, "[a]ll Defendants engaged in defamatory actions thereby causing reputational harm, a recognized injury under this rule, and [this injury] led to pecuniary losses."  [*Id.*].

These arguments fail because Mines has not pled facts plausibly suggesting that the Emory Defendants engaged in willful, wanton, or malicious conduct toward him.  Nor has he pled facts to show that he suffered a pecuniary loss from a tort involving a personal injury.  Mines simply sets forth conclusory assertions, which must be disregarded.  Moreover, to the extent that Mines relies on his defamation claim to support his negligent infliction of emotional distress claim, the Second

Amended Complaint contains no allegations suggesting that Mines's negligent infliction of emotional distress claim is based on his defamation claim. Instead, Mines bases his negligent infliction of emotional distress claim on (1) an alleged "pattern of reckless, negligent, and/or careless conduct" by the Emory Defendants and the individual Defendants [SAC ¶¶ 240, 245], (2) the Emory Defendants' and the individual Defendants' "repeated efforts to protect and maintain their professional and personal reputation despite actual knowledge of the years-long race discrimination directed at [Mines]" [*id.* ¶ 241], (3) the Emory Defendants' violation of their own policies [*id.* ¶ 242], (4) the Emory Defendants' "willful" refusals to investigate Mines's complaints about race discrimination [*id.* ¶ 243], and (5) the Emory Defendants' and the individual Defendants' alleged "calculated, extended, and extensive pattern of race discrimination and retaliation" [*id.* ¶ 244]. Mines may not add allegations to the Second Amended Complaint through arguments in a

response brief. *Walker*, 2008 WL 4004714, at *3 n.1. This argument, therefore, does not save the claim.

In short, Mines has not pled a plausible negligent infliction of emotional distress claim. The motion to dismiss should be granted as to Count Seven.

### 3.    Fraud in the Inducement (Count Ten)

In Count Ten of the Second Amended Complaint, Mines asserts a claim for fraud in the inducement. [SAC ¶¶ 294–304]. To state a claim for fraud, "a plaintiff must establish (1) a false representation by a defendant; (2) scienter; (3) intent to induce the plaintiff to act or refrain from acting; (4) justifiable reliance by plaintiff; and, (5) damage to plaintiff." *Endurance Am. Specialty Ins. Co. v. Quran Bolden Mgmt., LLC*, No. 1:18-cv-4008-LMM, 2020 WL 11191834, at *2 (N.D. Ga. Jan. 13, 2020). Further, Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). To comply with Rule 9(b), a plaintiff must set forth (1) "precisely what statements were made in what documents or oral representations or what omissions were made," (2) "the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same," (3) "the content of such statements and the manner in which they misled [the plaintiff]," and (4) "what [the defendant] obtained as a consequence of

119

the fraud." *Am. Gen. Life & Acc. Ins. Co. v. Ward*, 509 F. Supp. 2d 1324, 1335–36 (N.D. Ga. 2007).

Mines's fraud in the inducement claim is based on Boden's alleged assurance that Mines's title with the Falcons "has always been Head Team Medical, and it will not change for the 2023 Season." [SAC ¶ 295]. Mines states, "In reliance upon Boden's statements, [Mines] signed the 2023 Agreement." [*Id.* ¶ 295]. Mines also alleges, "At the direction of Emory Healthcare and the Emory Clinic, Dr. Boden fraudulently induced [Mines] to sign the 2023 Agreement and continue to serve as the Head Team Physician for the [Falcons for approximately three months after the expiration of the 2019 Agreement." [*Id.* ¶ 296]. Mines claims that "Boden and the Emory Defendants never intended to honor the 2023 Agreement nor did they intend to pay [Mines] for any of the work he performed for the [Falcons] after the expiration of the 2019 Agreement." [*Id.* ¶ 298]. Mines alleges that the "misrepresentations were material because they caused [Mines] to perform professional services for the [Falcons] that they would not have otherwise been entitled to without paying for it." [*Id.* ¶ 299]. According to the Second Amended Complaint, Mines "reasonably relied on Boden's representations after exercising necessary and reasonable diligence regarding his employment and contractual relationship with the [Falcons]." [*Id.* ¶ 300].

The remaining Defendants argue that Mines has not pled a plausible fraud claim because "actionable fraud cannot be predicated upon a breach of contract or a promise to perform or refrain from performing some act in the future." [Doc. 57-1 at 22]. In response, Mines argues that he can state a fraud claim based on Boden's promise about a future act because Boden made the promise without intending to perform it. [Doc. 62 at 22].

"The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future. Nor does actionable fraud result from a mere failure to perform promises made. Otherwise any breach of a contract would amount to fraud." *Equifax, Inc. v. 1600 Peachtree, L.L.C.*, 601 S.E.2d 519, 525–26 (Ga. Ct. App. 2004) (internal quotation marks and footnote omitted). "An exception to the general rule exists where a promise as to future events is made with a present intent not to perform or where the promisor knows that the future event will not take place." *Lumpkin v. Deventer N. Am., Inc.*, 672 S.E.2d 405, 408 (Ga. Ct. App. 2008) (footnote omitted). "A promise made without a present intent to perform is a misrepresentation of a material fact and is sufficient to support a cause of action for fraud." *Id.* (internal quotation marks and citation omitted).

Here, Mines presents only conclusory allegations to support his claim that Boden made the statement that Mines's title would remain Head Team Medical and

121

would not change for the 2023 season with knowledge that the statement was false or without intending to keep the promise. Mines, therefore, has not pled a plausible fraud claim based on this statement.

Nor has Mines pled facts showing that he justifiably relied on the statement. *See Freebirds, LLC v. Coca-Cola Co.*, 883 S.E.2d 388, 393 (Ga. Ct. App. 2023) (noting that to plead a fraud claim, "the complaint must show that one who relied upon the representations of another used the means available to him in the exercise of diligence to discover the truth."). Mines simply alleges that he "reasonably relied on Boden's representations after exercising necessary and reasonable diligence regarding his employment and contractual relationship with the [Falcons]." [SAC ¶ 300]. This allegation is conclusory and must be disregarded. Mines sets forth no facts about the investigation that he conducted or the inquiries he made, and he has not alleged facts suggesting that Boden concealed the truth from him so that he could not discover for himself that the statement was false. Mines, therefore, fails to plead that he justifiably relied on Boden's statement. *See Epple as Trustee for Se. Eng'g, Inc. Defined Benefit Plan v. Reich*, No. 1:23-cv-1482-MHC, 2024 WL 2745330, at *8–9 (N.D. Ga. Feb. 20, 2024) (finding that plaintiffs failed to plead justifiable reliance where they set forth no facts concerning the inquiry or investigation they

made or suggesting that the defendant concealed the truth from them so that they could not determine that the statement was false).

For the reasons above, Mines has not pled a plausible claim for fraud in the inducement.  Count Ten should be dismissed.

### 5.    Breach of Contract (Count Eleven)

In Count Eleven of the Second Amended Complaint, Mines asserts a breach of contract claim against the Emory Defendants.  [SAC ¶¶ 305–16].  Mines alleges that (1) he was a party to the 2019 and 2023 Agreements and was an intended third-party beneficiary of those Agreements [*id.* ¶¶ 306–07, 309, 311], (2) he provided services under the 2019 and 2023 Agreements and performed his obligations under the Agreements [*id.* ¶¶ 312–14], (3) under the 2019 and 2023 Agreements, the Falcons contracted to compensate the Emory Defendants "for team physician services and the time expended in performing those services" [*id.* ¶ 310], and (4) to date, the Emory Defendants have not compensated Mines for services that he provided to the Falcons between early February 2023 and May 11, 2023 [*id.* ¶ 315].

As discussed above, "'the essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom.'"  *Kabir*, 2011 WL 4500050, at *7 (quoting *TDS Healthcare Sys. Corp.*, 880 F. Supp. at 1583).  "A plaintiff asserting a breach of contract claim must allege

a particular contractual provision that the defendants violated to survive a motion to dismiss." *Id.*

Mines fails to identify a specific provision of the 2019 Agreement that required the Emory Defendants to pay him for medical services provided during the period from February 10, 2023, through May 11, 2023. The 2019 Agreement expired at the end of the 2022 football season, and it does not contain a provision setting forth the amount of compensation that Mines was supposed to be paid for providing medical services. [Doc. 1-5 at 1, 14]. The 2023 Agreement does not contain such a provision either. [Doc. 1-6 at 1, 13]. Mines, therefore, has not pled a plausible breach of contract claim against the Emory Defendants. *See Leslie v. Experian Info. Sols., Inc.*, No. 1:23-cv-330-ELR-JEM, 2024 WL 5396789, at *5-6 (N.D. Ga. Apr. 1, 2024) (recommending that the court dismiss a breach of contract claim where the plaintiff did not identify a provision of the contract that the defendant allegedly breached), *adopted by* 2024 WL 5396776 (N.D. Ga. Apr. 16, 2024) (Ross, J.). Count Eleven should be dismissed.

### 6.      Negligent Retention (Count Eight)

In Count Eight of the Second Amended Complaint, Mines asserts a claim for negligent retention against the Emory Defendants. [SAC ¶¶ 250–75]. To support this claim, Mines alleges that:

(1)  Those Defendants owed him "a legal duty of care... to exercise reasonable care and prudence in its employees' hiring, training, supervision, and retention." [SAC ¶ 251].

(2)  The Emory Defendants' "misconduct created an unreasonable risk of causing emotional distress to [Mines], and the [Emory Defendants] knew or should have known that such conduct was likely to result in emotional distress that might and/or likely would cause illness or bodily harm." [*Id.* ¶ 246].

(3)  Mines suffered harm from the Emory Defendants' "failure to address [his] ongoing complaints." [*Id.* ¶ 248].

(4)  When Mines complained to Mautner "that his termination from the [Falcons] was racially motivated," Mautner responded with the "tone-deaf," "highly offensive," "insensitive," and racially biased comment that this "could not be the case," stating that Mautner "had a Black son and, therefore, fully understood everything [Mines] experienced as a Black man." [*Id.* ¶¶ 253–54].

(5)  On November 25, 2023, Mines filed a complaint with Emory's DEI department, and he was later advised that Emory would not investigate his complaint. [*Id.* ¶ 255].

(6)  On February 8, 2024, Mines complained to Mautner and Boden about "ongoing insubordination and disrespect" from Richardson, but he was told that the School of Medicine and the Emory Clinic would not investigate the complaint because Emory Healthcare employed Richardson. [*Id.* ¶¶ 256–57]. Mines states that the School of Medicine and the Emory Clinic "deliberately chose not to investigate" the complaint. [*Id.* ¶ 258; *see also id.* ¶ 263 (stating that Emory Healthcare, the School of Medicine, and the Emory Clinic "deliberately chose not to conduct thorough investigations")].

(7)  Emory "repeatedly refused to investigate" Mines's complaints, which demonstrated Emory's "direct knowledge of and complicity in maintaining a racially discriminatory and retaliatory environment." [*Id.* ¶ 259].

125

(8)    After Mines reported race discrimination, "he suffered retaliation in the form of ongoing harassment, threats, and eventually termination." [*Id.* ¶ 260].

(9)    Emory Healthcare, the School of Medicine, and Emory Clinic were aware of the discrimination and harassment or should have known about it. [*Id.* ¶¶ 261–62].

(10)    Although it was foreseeable that Boden and Mautner would continue discriminating against Mines, they remained employed. [*Id.* ¶ 262].

(11)    Emory Healthcare, the School of Medicine, and the Emory Clinic did nothing, and they allowed Mautner and Boden to remain in supervisory positions even though they had actual or constructive knowledge of the misconduct and of the resulting harm to Mines. [*Id.* ¶¶ 265–270].

(12)    Emory Healthcare, the School of Medicine, and the Emory Clinic "breached the above-described legal duties of care that they owed to [Mines]." [*Id.* ¶ 271].

Under Georgia law, "an employer has a duty 'to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable from the employee's "tendencies" or propensities that the employee could cause the type of harm sustained by the plaintiff.'" *Edwards v. Wisc. Pharmacal Co., LLC*, 987 F. Supp.2d 1340, 1347 (N.D. Ga. 2013) (quoting *Munroe v. Universal Health Servs., Inc.,* 596 S.E.2d 604, 606 (Ga. 2004)). Negligent hiring, retention, and supervision claims "are derivative and cannot survive without an underlying tort." *Anderson v. Dunbar Armored, Inc.*, 678 F. Supp. 2d 1280, 1329 (N.D. Ga. 2009). "The claim[s] must be predicated on an

underlying state law tort that forms the basis of the injury against the plaintiff; [they] cannot be predicated on federal employment discrimination claims." *D'Angelo v. WellStar Med. Grp., LLC*, No. 1:18-CV-3873-MHC-JKL, 2019 WL 3006625, at *7 (N.D. Ga. May 3, 2019), *adopted by* 2019 WL 2267043 (N.D. Ga. May 28, 2019).

Mines's negligent retention claim fails for three reasons. First, Mines has pled no facts about Boden's and Mautner's relevant tendencies that allegedly caused Mines's injury. Instead, Mines simply alleges that Boden and Mautner engaged in unidentified retaliatory and discriminatory conduct. Second, Mines bases his negligent retention claim on his federal employment discrimination claims, and those claims cannot serve as the basis for a negligent retention claim. Third, Mines fails to plausibly allege an underlying state law tort claim for intentional infliction of emotional distress, fraud, or negligent infliction of emotional distress to support his negligent retention claim, and it is subject to dismissal.

In his response brief, Mines argues that he has pled a defamation claim. [Doc. 62 at 24–25]. Mines, however, did not allege in the Second Amended Complaint that his negligent retention claim was based on his defamation claim, and he cannot add allegations to the Second Amended Complaint in his response brief. *Walker*, 2008 WL 4004714, at *3 n.1. Mines cannot avoid dismissal of his negligent retention claim based on this argument.

127

For the reasons above, Mines has not pled a plausible negligent retention claim. Count Eight, therefore, should be dismissed.

## V.    **LEAVE TO AMEND**

Mines has already received two opportunities to amend his pleading. [Doc. 28; Doc. 29, First Am. Compl.; Doc. 51; Doc. 52, Second Am. Compl.]. And, Mines filed his First Amended Complaint and his Second Amended Complaint in response to Defendants' motions to dismiss. [Docs. 16, 20 (Motions to Dismiss); Doc. 25 (Motion to Amend); Docs. 36–37 (Motions to Dismiss Amended Complaint); Doc. 41 (Motion to Amend)]. Mines, therefore, had the benefit of reviewing Defendants' arguments for dismissing the claims, and he could have reframed his pleading accordingly. Mines, however, still failed to plead plausible federal claims, and all of his state law claims except for his defamation claim—which Defendants did not challenge—also fail to state plausible claims for relief. Mines has received enough opportunities to amend his pleading, and all of the claims in the Second Amended Complaint except for the defamation claim in Count Nine should be dismissed with prejudice. Alternatively, if the Court dismisses all of Mines's federal claims and declines to exercise supplemental jurisdiction over Mines's state law claims, the

128

federal claims should be dismissed with prejudice and the state law claims should be dismissed without prejudice.[11]

## VI.   <u>CONCLUSION</u>

Accordingly, I **RECOMMEND** that the Falcons' Partial Motion to Dismiss [Doc. 56] be **GRANTED**, that the Emory Defendants' and individual Defendants' Motion to Dismiss [Doc. 57] be **GRANTED**, and that the federal law claims contained in Counts One through Five of the Second Amended Complaint be **DISMISSED with prejudice**.  I further **RECOMMEND** that the district judge **DECLINE** to exercise supplemental jurisdiction over the state law claims contained in Counts Six through Thirteen and that those claims be **DISMISSED without prejudice**.

Alternatively, I **RECOMMEND** that the district judge **GRANT** both Motions to Dismiss and **DISMISS** Counts One, Two, Three, Four, Five, Six, Seven,

---

[11] "[T]he Court need not reach the merits of the state law claims if it declines to exercise supplemental jurisdiction." *Hyman v. Wells Fargo Home Mortg.*, No. 1:08-cv-06-CAM-RGV, No. 1:08-cv-23-CAM-RGV, 2008 WL 11470711, at *5 n.8 (N.D. Ga. Mar. 6, 2008), *adopted by* 2008 WL 11470747 (N.D. Ga. May 29, 2008). Instead, the Court should dismiss the claims without prejudice. *See Ingram v. Sch. Bd. of Miami-Date Cnty.*, 167 F. App'x 107, 109 (11th Cir. 2006) (per curiam) ("When a court decides not to exercise supplemental jurisdiction under § 1367(c)(3) because only state law claims remain, the proper action is a dismissal without prejudice so that the complaining party may pursue the claim in state court.").

Eight, Ten, Eleven, Twelve, and Thirteen of the Second Amended Complaint **with prejudice**.  If the district judge adopts this recommendation, only the defamation claim in Count Nine should remain pending.

      **SO REPORTED AND RECOMMENDED**, this 20th day of June, 2025.

_____
CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE